**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------X

CASPER SLEEP INC.,                                      :
                                                       :   Case No.
                        Plaintiff,                     :
                                                       :   **COMPLAINT**
     -against-                                         :
                                                       :   **JURY DEMAND**
NECTAR BRAND LLC, DREAMCLOUD                            :
HOLDINGS LLC, and DREAMCLOUD                            :
BRAND LLC,                                              :
                        Defendants.                    :
----------------------------------------------------------X

   Plaintiff Casper Sleep Inc. ("Plaintiff" or "Casper"), by its attorneys, Frankfurt Kurnit Klein

& Selz, PC, for its complaint (the "Complaint") against defendants Nectar Brand LLC

("Nectar"), DreamCloud Brand LLC ("DreamCloud"), and DreamCloud Holdings LLC

(collectively, "Defendants"), alleges as follows:

## NATURE OF THE ACTION

   1.      This is an action arising from Defendants' false advertising and deceptive acts and

practices under Section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)) and Sections 349 and 350

of the New York General Business Law.  Defendants have employed numerous deceptive tactics

to exploit the growing "bed-in-a-box" mattress industry popularized by Casper, including by:

(1) using deceptive advertising to mislead consumers concerning the qualities and abilities of

their mattresses; (2) misrepresenting the level of customer satisfaction with their products by

manipulating customer reviews on their websites; and (3) lying about the source and design of

their generic, "white label," imported mattresses.  To compound these deceptions, Defendants

launched a comprehensive scheme, in concert with purportedly independent mattress review

websites, to hype their products.  Defendants shamelessly promote the statements of the same

reviewers—who they compensate—on Defendants' websites and social media, in paid Google

advertisements, and in banner advertisements targeting unwitting consumers.  Defendants do all of this *without disclosing* that they are paying these reviewers handsomely, and therefore potential customers are unaware that the reviews are heavily incentivized.  Through this deceptive activity, Defendants have created a lucrative business built largely on deceiving consumers into buying their products.

2.      In early 2014, Casper launched as an innovative new sleep start-up, radically disrupting the traditional mattress industry with one mattress sold directly to consumers online with a risk free in-home trial—eliminating mattress stores and their inflated prices.  Casper's unique approach sought to create a universally comfortable product with a sleek design delivered straight to your door without the need for commission-driven salespeople working in retail stores.  Instead, Casper offers its mattresses directly to consumers via its e-commerce website.  Casper immediately struck a chord with consumers, generating $1 million in sales within its first month.

3.      Casper's award-winning, patented, and patent-pending mattress designs are the result of significant research and development.  In creating each of its mattresses and assorted bedding products, Casper strives to provide unparalleled comfort, support and temperature regulation for consumers.  In pursuit of this goal, Casper tested more than 200 support foam samples, created more than 100 prototypes, and conducted hundreds of hours of rigorous product testing.  Collectively, Casper's best-in-class product design team has won numerous awards and holds more than 50 patents.

4.      Casper's success has spawned numerous "imitators" that duplicate Casper's innovative approach without investing in any of the innovations that led to Casper.  *TechCrunch*, a leading media publication, previously noted that since Casper launched in April 2014, "[t]he past two years have also seen a boom in mattress startups . . . Casper does seem to have started a

trend."  The awards have continued to come year after year:  *TIME* Magazine honored the Casper mattress as the "Invention of the Year" in 2015; *Fast Company* magazine listed Casper as one of 2017's most innovative companies; *Good Housekeeping* made Casper one of its 2018 Lab Picks; and Casper was just rated the number one mattress brand by Consumer Reports.

5.      Defendants are two of the more recent "bed-in-a-box" startup followers.  Upon entering the market, Defendants—affiliated entities that sell mattresses under the brand names "Nectar" and "DreamCloud"—almost immediately sought to capture market share and divert sales from their more established competitors, such as Casper, through a series of false and misleading statements to consumers and undisclosed partnerships with mattress review websites. Defendants have shown little regard for complying with applicable law governing false advertising and deceptive business practices.  Defendants instead appear willing to engage in whatever tactic they deem necessary to mislead consumers into believing that their products are superior to those of their competitors.

6.      Indeed, notwithstanding their brief existence, Defendants' false and deceptive marketing practices already have been condemned by the Federal Trade Commission (the "FTC").  Ex. A (A true and correct copy of a draft administrative Complaint prepared by the FTC ("FTC Complaint")).  The FTC alleged that Nectar's promotion of its mattresses as "Designed and Assembled in USA" violated the Federal Trade Commission Act (the "FTCA") because Nectar's mattresses are, in actuality, imported from China and Nectar has no assembly operations in the United States.  *See* Ex. A; Ex. B (Agreement Containing Consent Order) ("FTC Settlement").  Nectar recently agreed to settle the FTC's claims by consenting to the entry of an order which prohibits it from making misrepresentations that its products are of United States origin and requires it to issue compliance reports to the FTC.  *See* Exs. A & B.  But, as discussed

below, Defendants' misrepresentations as to their products' origin are only part of a much broader scheme to deceive consumers.

7.      Beyond the FTC's claims, Defendants' advertising is a series of pitfalls for unwitting consumers, who are being misled throughout.  Defendants' advertising violates the Lanham Act and Sections 349 and 350 of the New York General Business Law, including by: (1) failing to provide adequate disclosure of Defendants' affiliate relationships with third-party review websites, while using those reviews to promote their products; (2) manipulating customer reviews on both the Nectar and DreamCloud websites to misrepresent how highly customers rate Defendants' products; (3) misrepresenting reviews by affiliates to convince consumers that independent review websites determined that Defendants' mattresses are superior to Casper's; and (4) making numerous other false and misleading statements, such as claiming that studies prove that consumers who sleep on Nectar mattresses fall asleep 20% faster than consumers who sleep on mattresses of competing brands, claiming that DreamCloud mattresses "relieve[] pressure points," and falsely promoting Defendants' white label Chinese-imported mattresses as being "Designed and Assembled in USA."

8.      Casper—and consumers—have suffered considerable injury as a result of Defendants' deceptive advertisements.  As a result, Defendants have damaged Casper's reputation, distorted the consumer marketplace, and deprived Casper of significant revenue due to lost sales.  In addition, Defendants have derived significant profits from their unlawful acts.

## JURISDICTION AND VENUE

9.      This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338 because it arises under the Lanham Act, 15 U.S.C. § 1051 *et seq.*  This Court has supplemental jurisdiction over Casper's state-law claims pursuant to 28 U.S.C. § 1367(a)

because they are so related to Casper's Lanham Act claim that they form part of the same case or controversy.

10.     This Court has personal jurisdiction over Defendants pursuant to CPLR § 302(a)(3).

11.     Venue is proper in this Court under 28 U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiff's claim occurred in the Southern District of New York.

## PARTIES

12.     Plaintiff Casper Sleep Inc. is an e-commerce company that sells mattresses and other sleep products.  Casper is incorporated under the laws of Delaware, with its principal place of business located at 230 Park Avenue South, New York, New York.

13.     Upon information and belief, Defendant Nectar Brand LLC is a limited liability company organized under the laws of California with its principal place of business located at 2000 University Avenue, East Palo Alto, California.

14.     Upon information and belief, Defendant DreamCloud Holdings LLC is a limited liability company organized under the laws of Delaware with its principal place of business located at 2000 University Avenue, East Palo Alto, California.

15.     Upon information and belief, Defendant DreamCloud Brand LLC is a limited liability company organized under the laws of Delaware with its principal place of business located at 2000 University Avenue, East Palo Alto, California.

## FACTUAL ALLEGATIONS

### *Casper's Early Success*

16.     Casper launched in 2014 with a single, state-of-the-art mattress product, sold directly to consumers through a simple online interface on http://www.casper.com.  Once

5

purchased, a Casper mattress is compressed and shipped in a box the size of a mini-fridge and small enough to fit in the trunk of a car or be delivered by bicycle messenger.

17.     Casper also has a free, no-hassle return policy: a mattress purchaser has a 100-day trial period, at any point during which he or she may return the mattress for a full refund.  Once notified of the return, Casper arranges for a courier to pick up the mattress for donation or recycling.

18.     Casper's business model eliminates the deceptive sales tactics and inflated, commission-driven prices commonly found in mattress retail stores.  Removing this middleman has contributed to Casper's success: the company earned over $600 million in revenue during its first calendar year and has attracted nearly $240 million in investment.

19.     Casper's ascent has also inspired many competitors.  Since Casper pioneered the digital mattress marketplace, dozens of online mattress retail start-ups have followed suit, selling mattresses on their own websites and on third-party platforms.

20.     Defendants began selling the Nectar and DreamCloud mattresses—two of the many followers and imitators of Casper's model—in or around July 2016 and June 2017, respectively.  Defendants are headquartered in California, source their products from China, and sell them online to consumers across the United States.  Defendants have used particularly egregious advertising tactics to mislead customers as to the quality of their mattresses and their alleged superiority over Casper and other competitors.  The FTC, as mentioned above, has already penalized Nectar for some of its deceptive practices; but, as detailed below, the FTC's complaint did not nearly encompass the entirety of the deception that Nectar and DreamCloud use to mislead consumers into buying their products.

### *The Rise and Regulation of Affiliate Marketing*

21.     In the wake of Casper's success and disruption of the traditional retail model, consumers can now purchase a wide variety of competing mattresses without ever stepping foot in a mattress store.  And as competition in the online mattress industry has increased, so has demand for independent, unbiased reviews of the many direct-to-consumer mattresses that are now available.  This has magnified the influence of consumer review websites on consumer purchasing behavior, which is particularly significant because consumers rely on these reviews in lieu of testing the mattresses themselves prior to purchase.

22.     The heightened importance of online reviews to consumer purchasing decisions has also lead to the rise of "affiliate marketing."  Affiliate marketing is a marketing strategy whereby the retailer rewards the reviewer or other "affiliate" for each purchase or website visit that the affiliate secures through its reviews.

23.     The use of "affiliate links" and "coupon codes" is a common form of affiliate marketing.  An affiliate link is a unique URL leading to a retailer's website that contains an identifier associated with the affiliate.  When a customer arrives at the retailer's website by clicking on this URL link, any resulting purchases are tracked and the affiliate receives a commission on each purchase.

24.     Coupon codes have the same function as affiliate links, but work slightly differently.  Rather than a unique URL, an affiliate is provided with a unique code that consumers may enter at the time of an online purchase, often to receive a discounted price.  When a consumer enters the code, the sale is attributed to the affiliate, who receives a commission.

25.     Affiliate marketing and related practices create relationships between reviewers and retailers that consumers would not reasonably expect.  As a result, regulators of commerce,

most notably the FTC, have made clear that these practices are unfair and deceptive if they are not effectively and conspicuously disclosed.

26.     In 2009, the FTC issued its Guides Concerning the Use of Endorsements and Testimonials in Advertising (the "Endorsement Guides"), using its authority under Section 5 of the FTCA to regulate unfair or deceptive acts or practices in or affecting commerce.  15 U.S.C. § 45; *see* 16 C.F.R. § 255.

27.     The Endorsement Guides specifically provide that "[w]hen there exists a connection between the endorser and the seller of the advertised product that might materially affect the weight or credibility of the endorsement (i.e., the connection is not reasonably expected by the audience), such connection must be fully disclosed."  16 C.F.R. § 255.5.

28.     In May 2015, the FTC released a set of answers to frequently asked questions regarding the Endorsement Guides.  Ex. C (The "Endorsement Guide FAQs," *available at* https://www.ftc.gov/tips-advice/business-center/guidance/ftcs-endorsement-guides-what-people-are-asking).

29.     One of the questions concerns what it means for a disclosure to be "clear and conspicuous" under the Endorsement Guides.  The FTC answered that "[t]o make a disclosure 'clear and conspicuous,' advertisers should use plain and unambiguous language and make the disclosure stand out.  Consumers should be able to notice the disclosure easily.  They should not have to look for it."  The FTC noted a few requirements to meet this standard; in general the disclosures must be (1) "close to the claims to which they relate"; (2) "in a font that is easy to read"; and (3) "in a shade that stands out against the background."

30.     Yet another question concerned what the responsibilities were of a company who used a network of bloggers to promote its products.  Ex. C.  The FTC replied that "[a]dvertisers need to have reasonable programs in place to train and monitor members of their network.  The

scope of the program depends on the risk that deceptive practices by network participants could cause consumer harm…. [I]t's up to you to make a reasonable effort to know what participants in your network are saying." *Id.*

31.     The FTC's rules and guidance regarding affiliate marketing and related practices reflect the fundamental legal principle that commercial speech must be true and non-misleading. As applied to business relationships between retailers and reviewers, this means that retailers must clearly and conspicuously disclose any material connections to reviewers that they have, whenever they point to those reviews as support for the superiority of that retailer's product. Also, retailers who create an affiliate advertising network have a responsibility to take reasonable measures to ensure that everyone in their network is complying with the law.  As discussed below, Defendants have utterly failed to do so, and have caused Casper significant damage as a result.

### *Defendants Aggressively Tout Their Affiliate Reviews Without Proper Disclosures*

32.     As part of their advertising strategy, Defendants have aggressively sought to partner with affiliate marketers and promote their purportedly independent reviews without adequately disclosing Defendants' paid relationship with those marketers.

33.     Defendants offer one of the most lucrative affiliate relationship programs in the industry.  *See* Ex. D (Nectar Affiliates Page, https://www.nectarsleep.com/p/affiliates/, as of May 18, 2018); Ex. E (DreamCloud Affiliates Page, https://www.dreamcloudsleep.com/p/affiliates/, as of May 18, 2018).  On a discrete webpage, reachable only by a link in small font at the bottom of its homepage, Nectar entices potential reviewers to "BECOME OUR AFFILIATE: CASH IN ON $15 BILLION MATTRESS INDUSTRY."  It also acknowledges that "NECTAR's affiliate program payouts are among the highest in the industry; plus, when you work with NECTAR you will also enjoy generous performance incentives, cash bonuses, and a personalized hands-on

approach to supporting your success."  Similarly, DreamCloud asks potential affiliates to "[j]oin our leading team in the $15 billion mattress industry" and brags:

> When you work with DreamCloud you will receive generous performance incentives, cash bonuses, additional perks, and … DreamCloud's affiliate program payouts are among the highest in the industry.

Ex. E.  Upon information and belief, DreamCloud and Nectar offer their affiliate marketers up to $200 per mattress sold—significantly more than most others in the industry.

34.     But once Defendants pay these high commissions—which inherently incentivize positive reviews—Defendants promote these paid reviews without adequately disclosing that the reviewers are compensated.

35.     Upon information and belief, one mattress review site in particular, memoryfoamtalk.com ("MFT"), is supported almost entirely by the income received from sales of Defendants' products.  Not surprisingly, the Nectar and DreamCloud mattresses are the highest rated mattresses on MFT.  *See* Ex. F (https://www.memoryfoamtalk.com/best-mattress/, as of May 18, 2018).  Upon information and belief, MFT promotes Defendants' products because of the large commissions and sales volumes that directly benefit MFT.  Neither of these motivations are disclosed by Defendants to consumers.

36.     Defendants also specifically create banner ads using these compensated reviews to advertise their products.  Examples of such banner ads are as follows:





37.     These ads appear while potential customers are reviewing unrelated sites on the internet, such as nytimes.com, as well as in their social media feeds.  These unsuspecting consumers are misled to believe that MFT is entirely independent of Defendants—there is no disclosure whatsoever of any affiliate relationship between the entities.  The reality, of course, is that MFT, Defendants, and other affiliate marketers derive significant income when consumers purchase Defendants' products.

38.     To further promote MFT and other affiliate reviews, upon information and belief, Defendants purchase Google AdWords so that, for example, ads for the Nectar and DreamCloud reviews on MFT and other affiliate sites, such as sleepsherpa.com ("Sleep Sherpa"), appear when users search for Nectar or DreamCloud products in Google searches.  Examples of such Google AdWords purchases are as follows:









39.     This behavior compounds Defendants' deception by leading consumers to believe that these particular review websites are among the most reputable and frequently searched. Again, there is no consumer disclosure on these ads of the connection between Defendants and their affiliate reviewers.

40.     In addition, Defendants' willingness to pay for increased consumer traffic to Defendants' affiliate's websites further incentivizes these affiliate marketers to review Defendants' products favorably.  In other words, Defendants surreptitiously direct consumers to Defendants' affiliate's review sites, which then extol the virtues of Defendants' mattresses and offer a discounted price.  The misled consumers then purchase Defendants' mattresses using the affiliate link or coupon code, resulting in revenue to Defendants and a hefty commission to the affiliate marketer.

41.     Even if consumers were to examine the limited disclosures on the webpages of certain of Defendants' affiliates, they would find no mention of Defendants.  MFT, in fact,

falsely proclaims in the "Compensation for Reviews/Affiliate Links" section of its disclosures (which is located far from the actual reviews and affiliate links) that "[n]o company which provides this type of commission pays explicitly more than any other."  Ex. G (https://www.memoryfoamtalk.com/disclosures/, as of May 18, 2018).  Yet Defendants, in contrast to MFT's "disclosure," explicitly state that their "payouts are among the highest in the industry."  Ex. D; Ex. E.

42.     Defendants' advertising thus violates applicable laws.  With their inadequate disclosure of their affiliate relationships and failure to ensure the proper disclosures by their affiliates, Defendants have misled consumers into believing that they have no connection to these third-party reviewers.

### *Defendants' Comparisons to Casper on Their Websites Are False and Misleading*

43.     Nectar and DreamCloud also explicitly target Casper in their comparative advertising using these paid affiliate reviews.  Nectar's website contains a web page purporting to be a "SIDE BY SIDE COMPARISON" of the Casper mattress to the Nectar mattress.  Ex. H (Comparison Page, https://www.nectarsleep.com/p/compare/casper/, as of April 2, 2018) ("Nectar/Casper Comparison Page").  Nectar unsurprisingly declares itself superior to Casper in every possible respect.  The comparison, however, is based on the statements of certain Nectar paid affiliate partners, namely, MFT, Sleep Sherpa, and getbestmattress.com.

44.     The Nectar/Casper Comparison Page begins with the statement:  "When third party reviewers did a side by side comparison of NECTAR with Casper, NECTAR was the clear winner from price to comfort," followed immediately by the quote, "My engineering team found this to be the best mattress for isolating motion of all the mattresses they have tested.' says SleepSherpa.com, a leading source for mattress reviews and just touching on a few of the components that make the NECTAR mattress a fan-favorite."  Ex. H.  But Sleep Sherpa *does not*

*review Casper products at all.*  Yet Nectar is deceiving consumers into believing that Sleep Sherpa's engineering team conducted a side-by-side comparison of Nectar and Casper mattresses and determined Nectar mattresses to be the best.

45.     Indeed, Sleep Sherpa is the most prominently featured review website on the Nectar/Casper Comparison Page.  The following quotes from Sleep Sherpa appear on the page in exaggerated font:

> NECTAR is a more affordable option. And affordable doesn't mean cheap. In this case you get quality and value.
>
> The dense foam used in the NECTAR can address certain pain points in ways other mattresses can't.
>
> My engineering team found this to be the best mattress for isolating motion of all the mattresses they have tested.

Ex. H.

46.     Nectar falsely implies to consumers that these statements are the result of "a side by side comparison of NECTAR with Casper," which they are not.

47.     Nectar also relies heavily on MFT's affiliate reviews in the Nectar/Casper Comparison Page.  For example:

> MemoryFoamTalk says that Casper is easily affected by weight and size due to the construction of its memory foams and the lack of edge support.
>
> There are "much better alternatives for price" says memoryfoamtalk.com of Casper, while NECTAR gets almost full 10/10 for price and value.

Ex. H.

48.     Moreover, the centerpiece of the Nectar/Casper Comparison Page is a chart of different mattress qualities, pitting Nectar against Casper on each category, derived again largely from MFT's reviews.  *Id.*  Despite the ample compensation that Nectar gives to MFT and other

affiliate reviewers—and the potential for bias that providing such compensation creates, which is the basis for the disclosure requirement—Nectar fails to include any meaningful disclosures.

49. Nectar's only disclosures on the Nectar/Casper Comparison Page concerning its affiliate relationships is, in very fine print, that "NECTAR *may* compensate third-parties for purchases made through the links in their reviews" (emphasis added). There is no explanation of which review websites were compensated. In fact, Nectar falsely implies that some review websites were *not* compensated.

50. Even if the substance of the disclosure were sufficient (it is not), the placement and small font of the disclosure is far from clear and conspicuous, as required by the FTC Endorsement Guides. As the FTC has recognized, "[d]isclosures should not be hidden . . . in blocks of text people are not likely to read" or in other "hard to find" places, and disclosures are not clear and conspicuous if "other elements in the ad or message obscure or distract from [them]." Ex. C. Nectar's "disclosure," however, is small and obscure, not clear and conspicuous. Nectar appears to have gone out of its way to obfuscate this disclosure. The single disclosure appears at the very bottom of the comparison chart and does not clearly disclose that the reviewers featured in the Nectar/Casper Comparison Page were paid. In other words, it is unlikely a reader would even see the small disclosure on the Nectar/Casper Comparison Page, but even if a reader did, the disclosure would not provide the information necessary to make the statements on that page not misleading—and the disclosure is misleading by itself.[1]

51. DreamCloud likewise incorporates false and misleading statements concerning Casper on its comparison pages, https://www.dreamcloudsleep.com/compare (Ex. I

---

[1] Recently, Nectar has attempted to remedy its inadequate disclosures and misleading comparison by adding additional language to the Comparison Page. Even if these changes were sufficient to cure the deception, which they are not, they do not remedy the damage caused by the prior version of the Comparison Page.

"DreamCloud General Comparison Page") and

https://www.dreamcloudsleep.com/p/compare/casper-mattress/ (Ex. J "DreamCloud/Casper

Comparison Page"). *First*, DreamCloud blatantly misrepresents the expense of the Casper Wave

mattress on the DreamCloud General Comparison Page. *See* Ex. I.  DreamCloud claims that the

Casper Wave queen size mattress costs $2,500 as compared to the DreamCloud queen size

mattress, which costs $1,399. *Id.*  But the Casper Wave mattress only costs $1,995 and the

DreamCloud mattress is listed at $1,599. *Id.*

  52.  *Second*, similar to the Nectar/Casper Comparison Page, the DreamCloud/Casper

Comparison Page relies predominantly on its paid affiliate reviews without any disclosure of its

affiliate relationships.  The DreamCloud/Casper Comparison Page leads with the statement that

"Review sites love DreamCloud," and includes quotes from affiliate Sleep Sherpa throughout to

support its alleged superiority over Casper, including:

> Sleepsherpa.com gave a leading overall score of 9.3 to DreamCloud, saying, "This mattress feels wonderful. It is a hybrid mattress which means springs and foam but it is so much more. Every layer contributes to the overall feel. What you will first notice when opening it is the soft and smooth cashmere blend over. The tufting on the mattress isn't just for looks either. It helps keep the material in place and dampens motion transfer. It also makes the mattress look like a puffy cloud.

Ex. J.

  53.  In addition to hiding from consumers that Sleep Sherpa is a paid affiliate, Sleep

Sherpa, as discussed above, does not review Casper products.  DreamCloud also relies on

another prominent affiliate, MFT:

> DreamCloud has taken the mattress industry by storm with leading scores from trusted third-party reviewers. Memoryfoamtalk.com summed it up best: "If you want a luxury hybrid mattress that sleeps cool and is super supportive and comfortable at a price 3-4x less than competing in-store mattresses of the same quality, with a lifetime warranty and 365 night sleep guarantee – the DreamCloud simply cannot be beat." When deciding between DreamCloud and Casper Wave, you won't regret choosing the Plush Life.

*Id.* Nowhere on the DreamCloud/Casper Comparison Page does DreamCloud notify consumers that it pays these "trusted third-party reviewers" for selling its products.

54.     Defendants are therefore deceiving customers in their purported comparisons to Casper's products.

### **_Defendants Misrepresent the Number and Quality of Customer Reviews on Their Websites_**

55.     In addition to deceiving consumers through their undisclosed use of affiliate reviews, upon information and belief, Defendants have also manipulated the appearance of customer reviews on their websites to deceive consumers into believing that customers rate Defendants more favorably than they actually do.

56.     As is common in the e-commerce industry, Defendants allow purchasers to review Defendants' products on their websites.  But, upon information and belief, Defendants deceptively and unlawfully remove or hide negative reviews.

57.     In particular, consumer reviewers on Nectar's website are required to rate the Nectar mattress between one and five stars.  Almost impossibly, it appears that Nectar has received hundreds or possibly thousands of reviews in the past three months and, until recently, every single one has been five stars. [2]  *See* Ex. K (https://www.nectarsleep.com/reviews, as of May 18, 2018).  Moreover, according to Nectar, despite having over 4,810 customer reviews, it has not had a three-star review in the past four months, a two-star review in the past seven months, or a one-star review *in the past eight months*.  Conversely, many of the five-star reviews that appear on Nectar's website are only hours old.

---

[2] Eighteen days ago, Nectar posted its first less than five-star review (which was four-stars) in over three months.

58.     No other company in the mattress industry has reviews this distorted—except one: DreamCloud. According to the DreamCloud website, the most recent review below five-stars of a DreamCloud product was a four-star review *two months ago*.

59.     Consumers viewing the reviews on Defendants' websites would believe that Nectar and DreamCloud have very few negative reviews, and no negative reviews within the last several months. But evidence external to the Nectar and DreamCloud websites tells a completely different story. A search for Nectar on the Better Business Bureau ("BBB") website, which includes DreamCloud, reveals that, just within the past year, consumers have lodged *over 219 customer complaints* against Defendants. *See* Ex. L (https://www.bbb.org/greater-san-francisco/business-reviews/bed-sales/nectar-sleep-in-e-palo-alto-ca-877354/reviews-and-complaints, as of April 26, 2018). In fact, between February 26, 2018 and April 26, 2018—when Defendants' websites claim that they have received nothing but five-star customer reviews—Defendants had *111 customer complaints* through the BBB. *Id.* As a result, the BBB has graded Defendants a D+.[3] (In contrast, Casper has received only ten such complaints in three years and has an A+ grade.) *Id.* It strains credulity that not one of these customers submitted a negative review directly to Defendants and that no customer rated Defendants anything less than five stars during that time.

60.     Other data further indicates that Defendants manipulate their customer ratings. Several irate Nectar mattress customers recently wrote on the review website honestmattressreviews.com concerning their experience having their reviews ignored or deleted from Nectar's website and its Facebook page. On March 14, 2018, for instance, a customer

---

[3] Nectar's grade very recently changed to a B-. Suspiciously, after almost a month without a single positive review, Nectar suddenly received fourteen positive reviews, with five of those new reviews posted on April 30, 2018 alone.

named Dan explains why he was extremely dissatisfied with Nectar's customer service and that "[t]he reviews on their website are garbage and they won't let you post a review."  Ex. M.  On March 20, 2018, Geri states that her review "mentioned the fact that Nectar needs to give realistic shipping times and improve their customer service."  Ex. N.  Apparently, "[t]hose remarks lead to failure to publish [Geri's] review and removal of similar comments from their Facebook page."  *Id.*  Scott, who was very dissatisfied with Nectar's shipping delays, noted that "it typically takes [Nectar] at least three days to respond to an email yet they quickly scrub their Facebook page of negative comments and block users from their page."  Ex. O.

61.     These customers, along with many others, apparently issued poor reviews of Nectar all within the two months.  But Nectar's deceptive practices shield these reviews from consumers; instead, Nectar—and DreamCloud—only display positive reviews so that they can advertise a misleadingly high cumulative customer rating.

### *Defendants Make Several Other False Statements About Their Products*

62.     In addition to the deception outlined above, Defendants make several other blatant misstatements in their advertising concerning their reviews and accolades.  For example, the Frequently Asked Questions (FAQs) on Nectar's website states:

> Q.  Tell me more about the NECTAR mattress.
>
> NECTAR makes the most comfortable mattress available. . . .  Thousands of NECTAR customers and *over 20 mattress review sites* think NECTAR is *the most comfortable mattress* you can purchase.

Ex. P (Nectar FAQs, https://www.nectarsleep.com/faq, as of May 18, 2018 (emphasis added)).

63.     It does not appear that there are twenty mattress review sites that have even reviewed Nectar's products, much less claimed that Nectar was the "most comfortable mattress

you can purchase."  Accordingly, this is yet another false or misleading statement in Nectar's advertising.

64.    Another false statement in Nectar's FAQs states:

Q.  How does the NECTAR feel?

After sleeping on NECTAR the words customers use in their 30 day feedback surveys are "love" or "need"… NECTAR is amazing to sleep on and *NECTAR sleepers actually fall asleep 20% faster than people who sleep on other mattresses (we actually ran a study)*.

Ex. P (emphasis added). Nectar even claims on its homepage it has "taken the recent advances in mattress and fabric technology and run with them. Having figured out the optimal levels of firmness, coolness, breathability, and comfort - we put them all into one mattress, making it the best mattress you've ever slept on. Period."  Ex. Q.

65.    The notions that Nectar sleepers fall asleep 20% faster than *everyone else* and that it has new advances in technology making its mattress "the best" are simply not credible.  But Nectar does not stop there.  It compounds these false statements by making unqualified assertions of having scientific studies to support this statement.  Even if Nectar had not affirmatively stated that it has studies supporting its claim of 20% faster sleep, the FTC requires "competent and reliable scientific evidence" in support of such claims.  By affirmatively stating it conducted such studies that prove this assertion, Nectar has multiplied its deceptive acts because, upon information and belief, such studies do not exist or fall well short of supporting this claim.

66.    Additionally, the FAQ page states as follows:

Q.  If NECTAR is such a great mattress, why does it cost so much less than others?

We think it's crazy to pay thousands of dollars for a mattress, especially when a *NECTAR has earned more comfort and quality awards than any mattress you can buy for any price.*

21

Ex. P (emphasis added).  Similarly, DreamCloud states that it "has received even higher points for comfort and quality awards than [any] other luxury mattress."   Ex. P (DreamCloud  FAQs,   https://www.dreamcloudsleep.com/faq,   as  of  May  18,  2018 (emphasis added)).

67.     Defendants' advertising is littered with references to awards supposedly conferred upon it, including Google search results describing Defendants' mattresses as "award winning." After a diligent search, however, Casper has been unable to identify Defendants' receipt of any industry award, much less support for Nectar's claim of having "more comfort and quality awards than any mattress you can buy for any price," or DreamCloud's claim that it "has received even higher points for comfort and quality awards than [any] other luxury mattress." This is made even more unlikely because Defendants have only been in the market for a short time.  Accordingly, such references to awards are just another part of Defendants' scheme to mislead customers in their advertising.

68.     Defendants also make specific false promises concerning solutions to pain, such as:  you will "wake up pain free"; that you can "sleep without pain or pressure"; that "Nectar molds to your body, relieving all your aches and pains"; and it provides an "end [to] nightly pain and discomfort."  Ex. Q (Nectar Homepage, https://www.nectarsleep.com/; Nectar Mattress Page, https://www.nectarsleep.com/mattress, as of May 18, 2018).  Nectar further assures consumers that its mattress "relieves pressure wherever you normally feel it the most" and that it is "[c]ertified [h]ealthier."  *Id.*  DreamCloud similarly claims that its mattresses "relieve[] pressure points while contouring to the body."  Ex. I (DreamCloud General Comparison Page). Without scientific testing to back up these claims, there is no way Defendants can guarantee such results from use of their products.  Upon information and belief, Defendants have not performed sufficient testing on their mattresses to support these claims.  Defendants' advertising is thus

riddled with misleading statements used to deceive potential customers, thereby harming those consumers, as well as competitors such as Casper.

### *Nectar Misrepresented that its Products Were "Designed and Assembled in the USA"*

69.     As discussed above, Nectar's deceptive practices have drawn the attention of the FTC.  The FTC recently alleged that Nectar violated the FTCA by disseminating advertisement and promotional materials claiming that Nectar mattresses were "Designed and Assembled in USA."  Ex. A (FTC Complaint).  In actuality, Nectar's mattresses are wholly imported from China and Nectar performs no assembly in the United States.  *Id.*  As a result of the FTC's claims, Nectar settled with the FTC and consented to an order restricting Nectar from making further claims that its mattresses were made in the United States, unless the mattresses met certain parameters outlined in the FTC Settlement.  Ex. B.

70.     Upon information and belief, Nectar had been making claims that its products were designed and assembled in the United States for over a year.  Nectar's white label imports, however, were neither designed nor assembled in the United States.  It is likely that well-meaning customers, who value promoting job growth and the American economy, value American production in their purchasing decisions.

71.     Casper designs its mattresses in San Francisco, California and assembles them in the United States for sale in the U.S. market.  Therefore, customers who could have chosen Casper as an alternative, if they knew that Nectar's beds were actually made in China, were likely duped into buying Nectar instead.  This activity by Nectar is deceptive, and Casper's business and consumers alike have been harmed by Nectar's false statements regarding the origin of its mattress products.

### *Casper's Damages*

72.     Defendants' deceptive and misleading advertisements have harmed Casper and the public.

73.     Upon information and belief, potential Casper mattress purchasers, including potential purchasers located in New York, have been deceived into purchasing Defendants' products through Defendants' false and misleading advertisements.  As a result, these consumers have purchased mattresses from Casper's competitor rather than Casper.

74.     Casper estimates that Defendants' conduct has caused it millions of dollars in lost sales to date, in addition to significant reputational harm.  Additionally, upon information and belief, Defendants have received sizable income as a result of their false and misleading advertisements.

75.     Defendants' actions have also harmed Casper's reputation by using deceptive tactics to hold themselves out as superior to Casper.

76.     Defendants have harmed, and continue to harm, the market and the public through their false and misleading statements, inadequate disclosures, and refusal to require adequate disclosures from their affiliate network.  In addition to the deception imposed on consumer purchasing decisions, Defendants' unlawful acts have harmed consumers' ability to find honest and independent reviews in a potentially opaque marketplace.  In turn, this unfairly damages Casper's ability to effectively market its products.

**FIRST CAUSE OF ACTION**
**(Violation of Section 43(a) of the Lanham Act – 15 U.S.C. § 1125(a))**

77.     Casper repeats and incorporates by reference the allegations contained in Paragraphs 1 through 76 above as if fully set forth herein.

78.      Defendants' conduct set forth above constitutes false advertising because it contains false and misleading representations and descriptions that are likely to mislead, or have

24

misled, consumers about the nature, characteristics, and quality of Defendants' products and/or Casper's products, and are likely to cause, or have caused, consumers to falsely believe, among other things, that Defendants' products are superior to Casper's products, all in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

79.     Defendants are willfully, knowingly and intentionally making false representations and descriptions of their products and Casper's products, and intend to continue making such false representations and descriptions in their advertising unless enjoined by this Court, so as to deceive, mislead and confuse consumers and the purchasing public into believing that, among other things, Defendants' products are superior to Casper's products.

80.     Defendants' false and/or misleading statements have a tendency to deceive a substantial portion of Defendants' intended audience of potential purchasers and, upon information and belief, these statements have actually deceived consumers.

81.     Defendants' false and/or misleading statements are material, in that they are likely to influence consumers' purchasing decisions and/or describe an inherent quality or characteristic of the product.

82.     Defendants' products are sold in interstate commerce.

83.     By reason of and as a direct and proximate result of Defendants' unlawful acts and practices, Defendants have caused, are causing, and, unless such acts and practices are enjoined by the Court, will continue to cause, immediate and irreparable harm to Casper, for which there is no adequate remedy at law, and for which Casper is entitled to injunctive relief.

84.     By reason of Defendants' unlawful acts and practices, including the false and misleading statements set forth herein, Casper has suffered, is suffering and will continue to suffer damage to its business, reputation and goodwill, and the loss of sales and profits Casper would have made but for Defendants' acts, in an amount to be determined at trial.

85.     Additionally, Defendants have received revenue in the form of sales of Nectar and DreamCloud mattresses caused by these false and misleading statements, in an amount to be determined at trial.

86.     The aforesaid acts and conduct of Defendants are, and unless enjoined will continue to be, in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

87.     Casper continues to be irreparably harmed by Defendants' wrongful conduct, for which it has no adequate remedy at law.

### SECOND CAUSE OF ACTION
### (Violation of Section 349 of the New York General Business Law)

88.     Casper repeats and incorporates by reference the allegations contained in Paragraphs 1 through 87 above as if fully set forth herein.

89.     As set forth above, Defendants engaged in deceptive practices through false and misleading statements and omissions in their consumer-oriented advertising.

90.     Defendants' deceptive acts and practices are consumer oriented in part because they are displayed prominently on their consumer-facing websites, in searches performed by consumers for DreamCloud, Nectar, or related terms, and in consumer-facing social media and other internet-related advertising.  Therefore, Defendants' deceptive acts and practices are used exclusively to influence consumers.

91.     Defendants' deceptive acts and practices are material, as they are likely to mislead a reasonable consumer acting reasonably under the circumstances.

92.     Defendants' deceptive acts and practices affect the public interest in New York because, upon information and belief, consumers located in New York have suffered injury by purchasing Defendants' products as a result of Defendants' deceptive acts and practices.

93.     By reason of and as a direct and proximate result of Defendants' deceptive acts and practices, Defendants have caused, are causing, and, unless such acts and practices are enjoined by the Court, will continue to cause, immediate and irreparable harm to Casper, for which there is no adequate remedy at law, and for which Casper is entitled to injunctive relief.

94.     By reason of Defendants' unlawful acts and practices, Casper has suffered, is suffering and will continue to suffer damage to its business, reputation and goodwill, and the loss of sales and profits Casper would have made but for Defendants' acts, in an amount to be determined at trial.

95.     Additionally, Defendants have received revenue in the form of additional sales caused by their deceptive acts and practices, in an amount to be determined at trial.

96.     The aforesaid acts and conduct of Defendants are, and unless enjoined will continue to be, in violation of Section 349 of New York's General Business Law.

97.     Casper continues to be irreparably harmed by Defendants' wrongful conduct for which there is no adequate remedy at law.

## THIRD CAUSE OF ACTION
### (Violation of Section 350 of the New York General Business Law)

98.     Casper repeats and incorporates by reference the allegations contained in Paragraphs 1 through 97 above as if fully set forth herein.

99.     As set forth above, the deceptive acts and practices at issue concern Defendants' advertisement activity.

100.    By reason of and as a direct and proximate result of Defendants' deceptive acts and practices, Defendants have caused, are causing, and, unless such acts and practices are enjoined by the Court, will continue to cause, immediate and irreparable harm to Casper, for which there is no adequate remedy at law, and for which Casper is entitled to injunctive relief.

101.    By reason of Defendants' unlawful acts and practices, Casper has suffered, is suffering and will continue to suffer damage to its business, reputation and goodwill, and the loss of sales and profits Casper would have made but for Defendants' acts, in an amount to be determined at trial.

102.    Additionally, Defendants have received revenue in the form of additional sales caused by their deceptive acts and practices, in an amount to be determined at trial.

103.    The aforesaid acts and conduct of Defendants are, and unless enjoined will continue to be, in violation of Section 350 of New York's General Business Law.

104.    Casper continues to be irreparably harmed by Defendants' wrongful conduct for which there is no adequate remedy at law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment:

(a)    Finding Defendants have violated Section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)) and Sections 349 and 350 of the New York General Business Law;

(b)    Enjoining and restraining Defendants from continuing all advertising activity in violation of the law including, but not limited to: (1) using affiliate reviews to promote Defendants' products without adequate disclosures; (2) allowing affiliate review websites to promote Defendants' products on said affiliate review websites without adequate disclosures; (3) continuing to make false statements regarding Defendants' superiority over Casper; (4) manipulating customer reviews on the Defendants' websites to misrepresent how highly customers rate Defendants' products; and (5) continuing to make false and misleading statements about Defendants' products;

(c)    Awarding damages in an amount to be determined at trial, including, but not limited to, disgorgement of profits and costs for corrective advertisement;

(d)    Awarding pre-judgment and post-judgment interest, to the fullest extent allowable at law or in equity, on all damages;

(e)    Awarding costs and disbursements of this action, including attorneys' fees; and

(f)    Granting such other and further relief as this Court deems just and proper.

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiff hereby demands, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure,

a trial by jury in this action.

Dated: New York, New York
May 18, 2018

FRANKFURT KURNIT KLEIN & SELZ, P.C.

By: __/s/ Craig B. Whitney__
Craig B. Whitney
Amelia K. Brankov
William C. Lawrence

488 Madison Avenue
New York, New York 10022
Tel.:  (212) 980-0120
Fax:  (212) 593-9175
cwhitney@fkks.com
abrankov@fkks.com
wlawrence@fkks.com

*Attorneys for Plaintiff Casper Sleep Inc.*