UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------

CASPER SLEEP, INC.,

                Plaintiff,

    - against -

NECTAR BRAND LLC, DREAMCLOUD
BRAND LLC, and DREAMCLOUD
HOLDINGS LLC,

                Defendants.

**ORDER**

18 Civ. 4459 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

        Plaintiff Casper Sleep, Inc. ("Casper") brings this action against Defendants Nectar Brand LLC ("Nectar"), DreamCloud Brand LLC ("DreamCloud"), and DreamCloud Holdings LLC ("DreamCloud Holdings"), asserting claims for false advertising under the Lanham Act, and deceptive business practices and false advertising under Sections 349 and 350 of New York's General Business Law. (Second Amended Complaint ("SAC") (Dkt. No. 46) ¶¶ 113-140) Pending before the Court is Defendants' motion to transfer this action to the Northern District of California. (Dkt. No. 51) For the reasons stated below, Defendants' motion will be denied.

## BACKGROUND

### I.    FACTS[1]

Both Plaintiff and Defendants sell mattresses online directly to consumers. (SAC (Dkt. No. 46) ¶¶ 1, 16-20) Plaintiff Casper is a Delaware corporation with its principal place of business in New York, New York. (Id. ¶ 12) Defendant Nectar is a California LLC; Defendant DreamCloud Holdings is a Delaware LLC; and Defendant DreamCloud is a Delaware corporation. All Defendants have their principal place of business in East Palo Alto, California. (Id. ¶¶ 13-15) Defendants sell mattresses under the brand names "Nectar" and "DreamCloud." (Id. ¶ 5)

The SAC alleges that Defendants have engaged in multiple "false and deceptive marketing practices" in order to "mislead consumers into believing that their products are superior to those of their competitors." (Id. ¶¶ 5-6) According to the SAC, "potential Casper mattress purchasers, including potential purchasers located in New York, have been deceived

---

[1] In resolving a transfer motion, a complaint's factual allegations are assumed to be true. Courts may also consider material extrinsic to the complaint. See, e.g., Tianhai Lace USA Inc. v. Forever 21, Inc., No. 16 Civ. 5950 (AJN), 2017 WL 4712632, at *2 (S.D.N.Y. Sept. 27, 2017) ("In resolving a motion for transfer, the Court assumes allegations in the Complaint to be true, but may also look to evidence outside of the Complaint, even to the degree that such evidence contradicts allegations in the Complaint."); Mohsen v. Morgan Stanley & Co. Inc., No. 11 Civ. 6751 (PGG), 2013 WL 5312525, at *3 (S.D.N.Y. Sept. 23, 2013) ("In deciding a motion to transfer, a court may consider material outside of the pleadings.") (collecting cases); Van Zon v. Powers, No. 06 Civ. 0086 (JFK), 2006 WL 3706310, at *3 (S.D.N.Y. Dec. 13, 2006) ("The court must take all allegations in the complaint as true, unless contradicted by the defendants' affidavits, and when an allegation is so challenged [a] court may examine facts outside the complaint to determine whether venue is proper. The court must draw all reasonable inferences and resolve all factual conflicts in favor of the plaintiff." (citations omitted)). Accordingly, in resolving Defendants' transfer motion, this Court has considered the SAC along with declarations and exhibits submitted by the parties.

into purchasing Defendants' products through Defendants' false and misleading advertisements."
(Id. ¶ 109) The Court discusses seriatim below the marketing practices challenged by Plaintiff.

### A. Affiliate Marketing

Plaintiff objects to Defendants' use of "affiliate marketing." "Affiliate marketing is a marketing strategy whereby the retailer rewards [a] reviewer or other 'affiliate' for each purchase or website visit that the affiliate secures through its reviews." (Id. ¶ 22) "Affiliate marketing and related practices create relationships between reviewers and retailers that consumers would not reasonably expect. As a result, regulators of commerce . . . have made clear that these practices are unfair and deceptive if they are not effectively and conspicuously disclosed." (Id. ¶ 25) "As part of their advertising strategy, Defendants have aggressively sought to partner with affiliate marketers and promote their purportedly independent reviews without adequately disclosing Defendants' paid relationship with those marketers." (Id. ¶ 32) Defendants use these reviews in advertisements promoting Nectar and DreamCloud mattresses. (Id. ¶¶ 36-39)

### B. SleepAuthority Website

Plaintiff also claims that Defendants' operation of www.sleepauthority.com ("SleepAuthority") constitutes a deceptive marketing strategy. According to the SAC,

> [t]his website . . . professes to be a website dedicated to helping people improve their sleep habits. In actuality, Defendants use it to publish brand-favorable content and steer online users to the Nectar and DreamCloud websites. In other words, at a glance, it appears to consumers that they are receiving advice from a third party, SleepAuthority, to buy a Nectar or DreamCloud [mattress]. But SleepAuthority is Nectar and DreamCloud – telling consumers to buy their own products.

(Id. ¶ 43) "Only by navigating through the rest of the SleepAuthority website, to the 'about' section, might a user stumble upon the statement that 'Sleep Authority is owned and operated by DreamCloud, LLC, which operates Nectar, DreamCloud[,] and Level.'" (Id. ¶ 49)

3

Defendants also use SleepAuthority to promotes Defendants' products on social media, "without any indication that SleepAuthority is actually Defendants' alter-ego." (Id. ¶ 44) Defendants also complain that the "content of [SleepAuthority's] promotions [of Defendants' products] is false and misleading in and of itself." (Id.)

"[P]otential Casper mattress purchasers – including ones located in New York – have been misled by the false statements in SleepAuthority ads, as well as the deceptive content on the website itself. [As a result], consumers who might have purchased a Casper mattress were . . . influenced into purchasing Defendants' mattresses." (Id. ¶ 52)

### C. Nectar and DreamCloud Websites

The SAC further alleges that Defendants employ deceptive marketing practices on their own websites. According to Defendants, Nectar's website contains a "side by side" comparison of Nectar and Casper, which "declares [Nectar] superior to Casper in every possible respect." (Id. ¶¶ 54-55) This comparison is misleading because it is based on comments from reviewers who either (1) do not review Casper mattresses, or (2) are affiliates of Defendants. (Id. ¶¶ 55-59) Nectar discloses that it "may compensate third-parties for purchases made through the links in their reviews," but only in small print at the bottom of the page – a disclosure that does not comport with FTC regulations. (Id. ¶¶ 60-61)

DreamCloud's website also compares its products with Plaintiff's, relying "predominately on its paid affiliate reviews without any disclosure of its affiliate relationships." (Id. ¶ 63) DreamCloud also misrepresents the cost of one of Plaintiff's mattresses. (Id. ¶ 62)

Nectar's website and DreamCloud's website contain additional false statements. (Id. ¶¶ 73-79) For example, Nectar claims it has studies to support the claim that its customers "fall asleep 20% faster than people who sleep on other mattresses" (id. ¶¶ 75-76); Nectar and

4

DreamCloud both claim to have won many awards (id. ¶¶ 77-78); and Nectar claims that its mattresses are designed and assembled in the United States. (Id. ¶¶ 80-81). According to Plaintiff, all of these statements are false.

Defendants "have also manipulated the appearance of customer reviews on their websites to deceive consumers into believing that customers rate Defendants more favorably than they actually do." (Id. ¶ 66) For example, Defendants' websites reflect almost exclusively five-star reviews, but Better Business Bureau records show more than 200 complaints about Defendants in the past year, and numerous one-star reviews. (Id. ¶¶ 67-70) Defendants' customers have also complained that their negative reviews have been deleted from Defendants' website. (Id. ¶¶ 71-72)

### D. Financing Program

Until August 3, 2018, Defendants offered a financing program for their mattresses that targeted "vulnerable lower income consumers." (Id. ¶¶ 83-84) Defendants advertised this program as having "no hidden fees" and being "transparen[t] and simpl[e]," but they "never adequately disclose[d] the [program's] outrageous fees and terms," including "exorbitant financing fees, harsh termination penalties, and other usurious terms." (Id. ¶¶ 84-86) The description of the program's terms was "hidden and incomplete," and a consumer using the program was not required to view the terms before signing up. (Id. ¶¶ 88-89; see id. ¶¶ 90-94) Customers who used this program "pa[id] at least 40% to 60% more for [their] mattress[es] over only a six-month period." (Id. ¶ 87)

### E. Pricing Promotions

Plaintiff alleges that "Defendants further obfuscate the financial terms of their products by falsely advertising discounts as limited offers when, in reality, those discounts are always available and the products are never sold at their purported 'regular' prices." (Id. ¶ 97)

## II. PROCEDURAL HISTORY

The Complaint was filed on May 18, 2018 (Dkt. No. 1), and the SAC was filed on November 14, 2018 (Dkt. No. 46). The SAC asserts claims for (1) false advertising under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); (2) deceptive business practices under Section 349 of the New York General Business Law; and (3) false advertising under Section 350 of the New York General Business Law. (Id. ¶¶ 113-140)

Defendants have moved to transfer this action to the Northern District of California. (Dkt. No. 51)

## DISCUSSION

## I. LEGAL STANDARD

Title 28, United States Code, § 1404(a) provides that, "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." 28 U.S.C. § 1404(a). "The purpose of § 1404(a) is 'to prevent waste of time, energy and money and to protect litigants, witnesses and the public against unnecessary inconvenience and expense.'" In re Stillwater Mining Co. Sec. Litig., No. 02 Civ. 2806 (DC), 2003 WL 21087953, at *2 (S.D.N.Y. May 12, 2003) (quoting Trehern v. OMI Corp., No. 98 Civ. 0242 (RWS), 1999 WL 47303, at *1 (S.D.N.Y. Feb. 1, 1999) (internal quotations omitted)).

Absent consent, "[a] motion to transfer involves two inquiries: (1) whether the action could have been brought in the proposed transferee district, in this case the [Northern District of California], and (2) whether transfer is warranted for the convenience of the parties and witnesses, in the interest of justice." CYI, Inc. v. Ja-Ru, Inc., 913 F. Supp. 2d 16, 18 (S.D.N.Y. 2012). In determining whether to grant a motion to transfer venue, courts consider "'(1) convenience of witnesses; (2) convenience of the parties; (3) location of relevant documents and the relative ease of access to sources of proof; (4) the locus of the operative facts; (5) the availability of process to compel the attendance of unwilling witnesses; (6) the relative means of the parties; (7) the comparative familiarity of each district with the governing law; (8) the weight accorded to plaintiff's choice of forum; and (9) judicial economy and the interests of justice.'" Megna v. Biocomp Labs. Inc., 220 F. Supp. 3d 496, 498 (S.D.N.Y. 2016) (quoting Frame v. Whole Foods Mkt., Inc., No. 06 Civ. 7058, 2007 WL 2815613, at *4 (S.D.N.Y. Sept. 24, 2007)); see also N.Y. Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc., 599 F.3d 102, 112 (2d Cir. 2010). "'No one factor is dispositive and the relative weight of each factor depends on the particular circumstances of the case.'" Megna, 220 F. Supp. 3d at 498 (quoting Smart Skins LLC v. Microsoft Corp., No. 14 Civ. 10149 (CM), 2015 WL 1499843, at *4 (S.D.N.Y. Mar. 27, 2015)).

The movant bears the burden of demonstrating – by clear and convincing evidence – that the balance of convenience and the interests of justice warrant transfer. See N.Y. Marine, 599 F.3d at 114 (approving district courts' application of the "clear and convincing" standard, because "the party requesting transfer carries the 'burden of making out a strong case for transfer'" (citing Filmline (Cross-Country) Prods., Inc. v. United Artists Corp., 865 F.2d 513, 521 (2d Cir. 1989))). "Before disturbing the plaintiff's choice of forum, there must be a clear

7

showing that transfer is in the best interests of the litigation." Telebrands Corp. v. Wilton Indus., Inc., 983 F. Supp. 471, 477 (S.D.N.Y. 1997) (citing Linzer v. EMI Blackwood Music, Inc., 904 F. Supp. 207, 216 (S.D.N.Y. 1995); Dwyer v. Gen. Motors Corp., 853 F. Supp. 690, 692 (S.D.N.Y. 1994)).

"A district court has broad discretion when deciding a motion to transfer venue." Bukhari v. Deloitte & Touche LLP, No. 12 Civ. 4290 (PAE), 2012 WL 5904815, at *2 (S.D.N.Y. Nov. 26, 2012) (citing N.Y. Marine, 599 F.3d at 112).

## II. ANALYSIS

### A. Whether This Action Could Have Been Brought in the Northern District of California

Venue is proper in "a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located." 28 U.S.C. § 1391(b)(1). Here, it is undisputed that venue is proper in the Northern District of California: Defendants' principal place of business is in Palo Alto, California. (See Schmeizer Decl. (Dkt. No. 53) ¶¶ 2-3) Defendants therefore reside in the Northern District of California, and this action could have been brought there.

### B. Whether the Balance of Convenience Factors Favor Transfer to the Northern District of California

Defendants argue that the convenience of the witnesses and parties, location of relevant evidence, and locus of operative facts all weight in favor of transfer to the Northern District of California. (Def. Br. (Dkt. No. 52) at 5-8)[2] Plaintiff's choice of forum is entitled to little weight here, Defendants argue, and the other factors are neutral. (Id. at 8-9)

---

[2] The page numbers referenced in this Order correspond to the page numbers designated by this District's Electronic Case Filing system.

Plaintiff opposes Defendants' motion to transfer, arguing that none of the nine Section 1404(a) factors favor transfer. (Pltf. Br. (Dkt. No. 59) at 2, 4)

1. **Convenience of Witnesses**

"The convenience of party and nonparty witnesses is generally considered the most important factor in deciding a motion to transfer venue." Houlihan Lokey Howard & Zukin Capital, Inc. v. Protective Grp., Inc., No. 05 Civ. 4741 (DC), 2005 WL 3367044, at *4 (S.D.N.Y. Dec. 12, 2005) (citing Frene N.V. v. Kmart Corp., No. 96 Civ. 9585 (LAP), 1998 WL 427688, at *3 (S.D.N.Y. July 29, 1998)). "When weighing this factor, 'a court does not merely tally the number of witnesses who reside in the current forum in comparison to the number located in the proposed transferee forum[;] [rather], the court must qualitatively evaluate the materiality of the testimony that the witnesses may provide." ESPN, Inc. v. Quiksilver, Inc., 581 F. Supp. 2d 542, 547 (S.D.N.Y. 2008) (citing Herbert Ltd. P'ship v. Elec. Arts Inc., 325 F. Supp. 2d 282, 286 (S.D.N.Y. 2004)).

"While this factor is 'principally aimed at weighing the relative convenience of non-party witnesses,' the convenience of party employees is still relevant." Blue Buffalo Co. Ltd. v. Nestle Purina PetCare Co., No. 3:14-CV-1665 (JCH), 2015 WL 13625758, at *3 (D. Conn. Feb. 13, 2015) (quoting MAK Mktg., Inc. v. Kalapos, 620 F. Supp. 2d 295, 309 (D. Conn. 2009)). Here, neither side has identified any non-party witnesses that might provide testimony in this action.

As to party witnesses, Defendants argue that the "most relevant witnesses" are employees of Defendants, the "vast majority" of whom reside in the San Francisco Bay Area. (Def. Br. (Dkt. No. 52) at 6) In support of this contention, Defendants have submitted two declarations from Craig Schmeizer, who is a co-founder of Nectar and DreamCloud, and the

9

business manager of all Defendants. (Schmeizer Decl. (Dkt. No. 53); Schmeizer Reply Decl. (Dkt. No. 57))

Schmeizer provides the following information concerning potential party witnesses:

- "There are approximately 4 employees involved in the creation and content of [SleepAuthority], and they include an employee in New York, an employee in the San Francisco Bay Area, and freelancers in Florida and Wisconsin." (Schmeizer Decl. (Dkt. No. 53) ¶ 6)

- "The employees that oversee the publication of customer reviews [on Defendants' websites] include a San Francisco-based content lead, and a Tel-Aviv, Israel based team." (Id. ¶ 5)

- "The content of the advertisements and statements on [Defendants' websites] . . . are created by an employee based in San Francisco . . . or by contractors or affiliates located in multiple overseas countries." (Id. ¶ 8; see also Schmeizer Reply Decl. (Dkt. No. 57) ¶ 3)

- "The pricing promotions on [Defendants' websites] . . . are created by employees based in the San Francisco Bay Area." (Schmeizer Decl. (Dkt. No. 53) ¶ 8)

- "The employee that oversaw the creation of [the] former financing program is based in the San Francisco Bay Area." (Id. ¶ 7)

- Commercial agreements with "affiliates" are "managed by [Schmeizer, who is based in the San Francisco Bay area,] or by another employee based in the San Francisco [B]ay [A]rea." (Id. ¶ 9)

Plaintiff has submitted a declaration from Jeff Brooks, its chief marketing officer. (Brooks Decl. (Dkt. No. 58)) Brooks states that 247 of Casper's 347 employees are located in New York, including its "core corporate executives." (Id. ¶¶ 3-4) Brooks further asserts that Casper's

> key corporate functions at issue in this lawsuit are based in New York City, including Casper's creative, marketing, data and analytics, technology, customer experience, operations, and finance teams. . . . As a result, all (or nearly all) of Casper's employee witnesses relevant to the issues in this case are located in New York.

10

(Id. ¶ 4-5)

Neither Plaintiff's declaration nor Defendants' declaration sheds light on the convenience of the witnesses factor. Plaintiff does not explain which of its employees might testify, or how their testimony might be relevant in this case, which is premised on allegedly deceptive marketing strategies employed by Defendants.

As to Defendant's declaration from Mr. Schmeizer, it is impossible to determine how many employees Schmeizer is referring to. Is the San Francisco employee who creates content for Defendants' websites the same San Francisco employee who creates content for SleepAuthority? Is the San Francisco employee who created the pricing promotions on Defendants' websites the same person who created the financing program challenged by Plaintiff? Because Schmeizer does not name any employee, the Court does not have a sense of how many San Francisco-based employee-witnesses there are, and is not able to "qualitatively evaluate the materiality of the testimony" each witness would provide. ESPN, Inc., 581 F. Supp. 2d at 547; see also CYI, Inc. v. Ja-Ru, Inc., 913 F. Supp. 2d 16, 22 (S.D.N.Y. 2012) ("As a rule, a party seeking a transfer must provide the Court with a specific list of the probable witnesses who will be inconvenienced if required to testify in the present forum." (citing Kiss My Face Corp. v. Bunting, No. 02 Civ. 2645 (RCC), 2003 WL 22244587, at *1-2 (S.D.N.Y. Sept. 29, 2003); NBA Props. v. Salvino, Inc., No. 99 Civ. 11799 (AGS), 2000 WL 323257, at *5 (S.D.N.Y. March 27, 2000))).

It also appears that many of Defendants' potential witnesses live outside California. Indeed, Schmeizer's declaration references employee-witnesses and contractor-witnesses in New York, Florida, Wisconsin, Israel, and "multiple [other] overseas countries." (Schmeizer Decl. (Dkt. No. 53) ¶¶ 5-9) For Defendants' non-San Francisco-based employee-

11

witnesses and contractor-witnesses, "it would be equally convenient . . . to fly to New York and stay in a hotel as it would be for them to fly to [San Francisco] and stay in a hotel." Telebrands Corp., 983 F. Supp. at 477-78.

The Court concludes that the convenience of witnesses factor is neutral.

### 2. Convenience of the Parties

The Court next considers the convenience of the parties. "'A defendant moving for transfer must show both that the original forum is inconvenient for it and that the plaintiff would not be substantially inconvenienced by a transfer.'" SBAV LP v. Porter Bancorp, Inc., No. 13 Civ. 372 (PAE), 2013 WL 3467030, at *8 (S.D.N.Y. July 10, 2013) (quoting 15 Charles Alan Wright, et al., Federal Practice and Procedure § 3849 (3d ed.2007)). "A 'mere shifting of inconveniences' is not sufficient to transfer a case." Walker v. Jon Renau Collection, Inc., 423 F. Supp. 2d 115, 118 (S.D.N.Y. 2005) (quoting Arrow Elecs., Inc. v. Ducommun, Inc., 724 F. Supp. 264, 266 (S.D.N.Y.1989)).

Here, Plaintiff's principal place of business is in New York City, and Defendants' principal place of business is in Palo Alto, California. Although Defendants argue that Plaintiff has a San Francisco office (Def. Br. (Dkt. No. 52) at 8), Plaintiff has shown that its New York presence is much more substantial – more than two-thirds of its employees, and all of its "core corporate executives," work in New York. (Brooks Decl (Dkt. No. 58) ¶¶ 3-4)

The Court concludes that transfer would "merely shift the burden of inconvenience from one party to the other." Dwyer v. Gen. Motors Corp., 853 F. Supp. 690, 693 (S.D.N.Y. 1994) (citing Schieffelin & Co. v. Jack Co., 725 F. Supp. 1314, 1322 (S.D.N.Y. 1989)). Accordingly, this factor is neutral.

### 3. Location of Relevant Evidence

"The location of relevant documents is largely a neutral factor in today's world of faxing, scanning, and emailing documents. Defendant[s have] indicated no special facts that would make this factor weigh in [their] favor." Am. S.S. Owners Mut. Prot. & Indem. Ass'n, Inc. v. Lafarge N. Am., Inc., 474 F. Supp. 2d 474, 484 (S.D.N.Y. 2007) (citing Aerotel Ltd. v. Sprint Corp., 100 F. Supp. 2d 189, 197 (S.D.N.Y. 2000)), aff'd sub nom. N.Y. Marine & Gen. Ins. Co., 599 F.3d at 112.

### 4. Locus of Operative Facts

"The location of the operative facts is traditionally an important factor to be considered in deciding where a case should be tried." 800-Flowers, Inc. v. Intercontinental Florist, Inc., 860 F. Supp. 128, 134 (S.D.N.Y. 1994). "To determine where the locus of operative facts lies, courts look to 'the site of events from which the claim arises.'" Kalapos, 620 F. Supp. 2d at 310 (quoting 800-Flowers, Inc., 860 F. Supp. at 134).

In a Lanham Act false advertising case such as this, the locus of operative facts is where the defendant's actions "giving rise to [plaintiff's] claims" occurred. Enigma Software Grp. USA, LLC v. Malwarebytes Inc., 260 F. Supp. 3d 401, 410-11 (S.D.N.Y. 2017). Here, the allegedly deceptive marketing programs cited by Plaintiff were developed in numerous locations, including San Francisco; Tel Aviv, Israel; New York; Florida; Wisconsin; and "multiple overseas countries." (Schmeizer Decl. (Dkt. No. 53) ¶¶ 5-9) Because the allegedly deceptive marketing programs "giving rise to [Casper's] claims" were created and overseen by individuals located across the United States and overseas, the Court concludes that this factor is neutral. Malwarebytes Inc., 260 F. Supp. 3d at 410-11.

### 5. Plaintiff's Choice of Forum

"A plaintiff's choice of forum is accorded considerable weight in the § 1404(a) balancing test." SBAV LP, 2013 WL 3467030, at *11 (citing Bukhari, 2012 WL 5904815, at *5 (collecting cases)). "However, 'a plaintiff's choice of forum is given less weight where the case's operative facts have little connection with the chosen forum.'" Alden Corp. v. Eazypower Corp., 294 F. Supp. 2d 233, 237 (D. Conn. 2003) (quoting 800-Flowers, Inc., 860 F. Supp. at 134).

Here, Plaintiff is headquartered in New York, and alleges that Defendants' deceptive marketing practices misled customers in New York. "[Plaintiff's] residence in [New York] is thus not the sole connection that this case has to this state." Blue Buffalo Co. Ltd., 2015 WL 13625758, at *3. Plaintiff has not demonstrated that this case's operative facts have a substantial connection with New York, however. Accordingly, this factor is neutral.

### 6. Other Factors

The parties agree that the remaining factors – the availability of process to compel the attendance of unwilling witnesses, the relative means of the parties, the forum's familiarity with the governing law, and trial efficiency and the interests of justice – are neutral. (Def. Br. (Dkt. No. 52) at 8; Pltf. Br. (Dkt. No. 59) at 8) The Court agrees.

\*   \*   \*   \*

Having considered all of the Section 1404(a) factors, the Court concludes that Defendants have not met their burden to show, by "clear and convincing" evidence, that the balance of convenience factors and the interests of justice favor transfer. See N.Y. Marine & Gen. Ins. Co., 599 F.3d at 114. "Before disturbing the plaintiff's choice of forum, there must be a clear showing that transfer is in the best interests of the litigation." Telebrands Corp., 983 F.

14

Supp. at 477 (citing Linzer, 904 F. Supp. at 216; Dwyer, 853 F. Supp. at 692). Given that the Section 1404(a) factors here are neutral, Defendants have not provided the type of "clear-cut showing" necessary to warrant transfer. See Schieffelin & Co., 725 F. Supp. at 1321.

## CONCLUSION

For the reasons stated above, Defendants' motion to transfer this case to the Northern District of California is denied. The Clerk of Court is directed to terminate the motion (Dkt. No. 51).

The Court will conduct an initial pretrial conference in this action on **October 24, 2019 at 4:00 p.m.** in Courtroom 705 of the Thurgood Marshall Courthouse, 40 Foley Square, New York, NY. Ten days before the conference, the parties will submit a joint letter addressing the following items in separate paragraphs: (1) a brief description of the case, including the factual and legal bases for the claims and defenses; (2) any contemplated motions; and (3) the prospect for settlement. For the Court's convenience, the parties must set forth the conference's date and time in the joint letter's opening paragraph. In preparing their joint letter and proposed case management plan, the parties are directed to consult the Court's Individual Practices and model Case Management Plan and Scheduling Order – both of which are available on this District's website.

Dated: New York, New York
September 27, 2019

SO ORDERED.

_Paul G. Gardephe_
Paul G. Gardephe
United States District Judge

15