UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CASPER SLEEP, INC.,

                      Plaintiff,

      - against -

NECTAR BRAND LLC, DREAMCLOUD
BRAND LLC, and DREAMCLOUD
HOLDINGS, LLC,

                Defendants.

**<u>ORDER</u>**

18 Civ. 4459 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

        In this action, Plaintiff and Defendants – who are direct competitors in the online mattress industry – bring claims and counterclaims alleging false advertising and deceptive practices under the Lanham Act and New York General Business Law, Sections 349-350. Defendants have moved to dismiss Plaintiffs' claims in the Second Amended Complaint to the extent they are premised on Defendants' Sleep Authority website, promotional pricing and financing program. (Def. Br. (Dkt. No. 74) at 6)[1] Plaintiff has moved to dismiss Defendants' counterclaims. (Pltf. Br. (Dkt. No. 79) at 10) For the reasons stated below, Defendants' motion to dismiss will be granted, and Plaintiff's motion to dismiss Defendants' counterclaims will be granted.

---

[1] The page numbers of documents referenced in this Order correspond to the page numbers designated by this District's Electronic Case Files ("ECF") system.

## BACKGROUND

I.    FACTS[2]

    A.    **Plaintiff's Claims**

Plaintiff Casper Sleep, Inc. is an e-commerce company that launched in early 2014.  Casper sells mattresses and other sleep products directly to consumers online.  (Second Am. Cmplt. ("SAC") (Dkt. No. 46) ¶¶ 2, 12, 16, 17)  Defendant Resident Home LLC[3] is the parent company of Defendant Nectar Brand LLC and Defendant DreamCloud Brand LLC.  Nectar and DreamCloud began competing with Plaintiff in the online mattress industry in July 2016 and June 2017, respectively.  (Id. ¶¶ 4, 5, 14, 20)

    1.    **Affiliate Reviews**

Plaintiff alleges that Defendants "offer one of the most lucrative affiliate relationship programs in the industry," and "promote . . . paid [affiliate] reviews without adequately disclosing that the reviewers are compensated."  (Id. ¶¶ 32-34)  Affiliate reviews are promoted through banner ads and the purchase of Google AdWords, which "compounds Defendants' deception by leading consumers to believe that these particular review websites are among the most reputable and frequently searched."[4]  (Id. ¶¶ 36-39)

    2.    **SleepAuthority Website**

Plaintiff alleges that Defendants operate the "SleepAuthority" website, which claims to be dedicated to helping people improve their sleep habits.  According to Plaintiff,

---

[2]  The following facts are drawn from the Second Amended Complaint and Defendants' Counterclaim and are presumed true for purposes of resolving the parties' motions to dismiss.  See Kassner v. 2nd Ave. Delicatessen, Inc., 496 F.3d 229, 237 (2d Cir. 2007).

[3]  Defendant "DreamCloud Holdings LLC changed its name with the Delaware Secretary of State to Resident Home LLC on August 19, 2019."  (Def. Br. (Dkt. No. 74) at 5 n.1)

[4]  Defendants have not moved to dismiss Plaintiff's claims to the extent they are premised on affiliate reviews.

Defendants use this website to "publish brand-favorable content and steer online users to the Nectar and DreamCloud websites."  (Id. ¶ 43)  SleepAuthority promotes Defendants' products by posting on social media and elsewhere, without any disclosure that SleepAuthority is Defendants' alter-ego.  (Id. ¶ 44)  Although SleepAuthority discloses in the "about" section of its website that "Sleep Authority is owned and operated by DreamCloud, LLC, which operates Nectar, DreamCloud and Level," Plaintiff complains that this disclosure is made in "an obscure location entirely separate from the deceptive content, where consumers are unlikely to see it." (Id. ¶ 49)  Plaintiff claims that it has been harmed by the SleepAuthority website because "consumers who might have purchased a Casper mattress were . . . influenced [by the website] into purchasing Defendants' mattresses."  (Id. ¶ 52)

### 3.      Defendants' Websites

Plaintiff further complains that Defendants' own websites contain numerous false or misleading statements, including:  (1) misleading comparisons to Casper products, which rely on affiliate reviews that do not concern Casper products (id. ¶¶ 54-65); (2) manipulated customer reviews (id. ¶¶ 66-72); and (3) false statements touting Defendants' mattresses, including how comfortable they are and where they were designed and assembled.[5]  (Id. ¶¶ 73-82)

### 4.      Financing Program

According to Plaintiff, Defendants offer their customers the option of paying for mattresses in six "interest free" monthly installments with "no hidden fees."  (Id. ¶¶ 83-85)  Both Defendants represent to consumers that "[a]ll fees are disclosed in the agreement you sign before you are charged."  (Id. ¶ 85)  According to Plaintiff, however, Defendants never provide

---

[5]  Defendants have not moved to dismiss Plaintiff's claims to the extent they are premised on allegations concerning Defendants' own websites.

consumers with a purchase agreement that discloses all of Defendants' fees, nor are consumers ever asked to sign a purchase agreement.  (Id. ¶ 86)  Instead, a consumer accessing Defendants' websites can select a mattress, choose the six monthly payments option, provide credit card information, and place an order, all without ever seeing a description of Defendants' Financing Program or a purchase agreement.  (Id.)  According to Plaintiff, consumers can access the purchase agreement only by clicking on a "Financing" link at the bottom of Defendants' websites, scrolling to the bottom of the Financing Program webpage, and then clicking on another link.  (Id. ¶ 88)  Moreover, the purchase agreement on the Financing Program webpage does not disclose all of the fees associated with financing a Nectar or DreamCloud mattress, nor does it disclose that the annual percentage rate ("APR") can increase to as much as 312%.  (Id. ¶¶ 89, 90)  Defendants also charge a "lease origination fee," a "late payment" fee, and a "reinstatement fees."  According to Plaintiff, these fees are either not disclosed or are "obfuscate[d]."  (Id. ¶ 91)  Plaintiff claims that Defendants' customers who use financing pay at least 40% to 60% more than the advertised cost of Defendants' mattresses over a six-month period.  (Id. ¶ 87)

Plaintiff also complains that Defendants misrepresent to their financing customers that there is a 365-day risk-free trial.  (Id. ¶ 93)  Nectar tells its customers:  "If you decide for any reason that Nectar is not your ideal mattress, we'll remove the mattress from your home and refund your payment 100%."  (Id.)  DreamCloud similarly states:  "Our finance customers also enjoy the benefits of our 365 night trial."  (Id.)  In reality, under the terms of Defendants' financing program, penalty-free cancellation of a transaction is permitted only within three business days of signing a purchase agreement; consumers are otherwise required to remain in the financing arrangement for at least three months.  (Id. ¶ 94)

5.    **Promotional Pricing Scheme**

Plaintiff alleges that Defendants "falsely advertised discounts as limited offers when, in reality, those discounts are always available and the products are never sold at their purported 'regular' prices." (Id. ¶ 97)  For example, the Nectar website regularly advertises the same "sale" "differently depending on the season (e.g., 'Tax Return Sale!' 'Fall Sale,' 'Halloween Sale,' and others)," when in fact the purported "sale" price is the prevailing price of the product and not a limited-time offer.  (Id. ¶ 98)  The DreamCloud website advertises "sales" in a similar fashion.  (Id. ¶ 102)  Plaintiff further alleges that Defendants "have never sold and do not intend to sell" their mattresses "at the purportedly 'former' price[s]" listed on their websites. (Id. ¶¶ 100-01, 103)

6.    **Injury**

Plaintiff alleges that Defendants' deceptive and misleading advertisements have harmed Casper and the public.  (Id. ¶ 108)  Consumers who otherwise might have purchased Plaintiff's mattresses "have been deceived into purchasing Defendants' products through Defendants' false and misleading advertisements," resulting in Plaintiff suffering millions of dollars in lost sales and reputational harm.  (Id. ¶ 109-11)  The public was harmed by "the deception imposed on consumer purchasing decisions" and "consumers' inability to find honest and independent reviews in a potentially opaque marketplace."  (Id. ¶ 112)

7.    **Causes of Action**

The SAC pleads claims for false advertising in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and alleges deceptive acts and practices in violation of Sections 349-350 of the New York General Business Law ("NY GBL").  (Id. ¶¶ 113-140)

B.    **Defendants' Counterclaims**

Defendants allege that Plaintiff has engaged in deceptive and unfair conduct to increase its sales at the expense of Defendants Nectar and DreamCloud online mattress business, including by "using [Plaintiff's] financial influence over mattress review sites to drive consumers to Casper, manipulating the number of its customer reviews, and manipulating the substance of those reviews."  (Counterclaims (Dkt. No. 20) ¶ 1)

1.    **Website Manipulation**

Defendants allege that on April 29, 2016, Plaintiff sued three mattress review sites – Sleepopolis, Mattress Nerd, and Sleep Sherpa – for unfair advertising.  According to Plaintiff, Defendants brought the lawsuit in order "[t]o coerce review sites . . . to remove or change their less favorable reviews [of Defendants' mattresses]."  (Id. ¶ 16)  Mattress Nerd and Sleep Sherpa entered settlements with Defendants and removed their reviews of Plaintiff's mattresses.  (Id.)  Plaintiff then "provided a loan to a subsidiary of a third company in the mattress review space [ – JAKK Media – whose reviews were] favorable to Casper . . . to purchase the Sleepopolis site."  (Id. ¶ 17)  Two weeks later, Sleepopolis "radically changed its review of Casper, ranking it first in its list of recommended mattress[es]."  (Id.)  JAKK Media had also purchased two other review sites, MattressClarity and SlumberSage, which soon changed their reviews of Casper mattresses, making the reviews more favorable to Plaintiff's products.  (Id. ¶ 18)  According to Defendants, the review changes were the result of Plaintiff's "financial influence over these sites."  (Id. ¶ 19)

2.    **Review Manipulation**

Defendants also allege that Plaintiff manipulated "Google and Amazon reviews [of Plaintiff's products to] create[] the false and misleading impression that its mattresses have

received both more reviews and stronger reviews than they actually have."  (Id. ¶ 22)  According
to Defendants, "as of July 10, 2018, Google Shopping did not have a single review of
Casper.com after December 20, 2017."  While Google has 30,197 reviews of Casper.com
products – with an average rating of 4.9 stars – many of the five star reviews have no comments,
while many of the one, two, and three star reviews have comments.  (Id. ¶ 20)  "[T]he
independent website ReviewMeta.com, which analyzes user reviews on Amazon," gives
Casper's Amazon reviews "a 'Fail' grade due to the detection of unnatural reviews.  In
particular, 472 reviews with an average score of 4.7 were deleted, raising a likelihood that those
deleted reviews were fake."[6]  (Id. ¶ 21)  "435 reviews, or roughly 40% of Casper's total Amazon
reviews, were deleted in March 2018, indicating [that] those reviews were detected as fake."[7]
(Id.)

### 3.    Defendants' Causes of Action

Defendants' counterclaims allege false and misleading statements in violation of
Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); false and misleading statements in
violation of California's False Advertising Law ("CA FAL"), Cal. Bus. & Prof. Code §§ 17500,
et seq.; and unfair competition in violation of California's Unfair Competition Law ("CA UCL"),
Cal. Bus. & Prof. Code §§ 17200, et. seq.  (Id. ¶¶ 23-43)

## II.    PROCEDURAL HISTORY

The Complaint was filed on May 18, 2018.  (Dkt. No. 1)  Defendants filed an
answer and counterclaims on July 13, 2018.  (Dkt. No. 20)  On August 3, 2018, Plaintiff filed the

---

[6] The Counterclaim does not specify who deleted these 472 reviews.
[7] The Counterclaim does not specify who deleted these 435 reviews.

First Amended Complaint (Dkt. No. 28), and on November 14, 2018, Plaintiff filed the SAC on consent.  (Dkt. No. 46)

On December 21, 2018, Defendants moved to transfer this action to the Northern District of California.  (Dkt. No. 51)  On September 27, 2019, this Court denied Defendants' motion to transfer.  (Dkt. No. 62)

On January 16, 2020, Plaintiff and Defendants filed their respective motions to dismiss.  (Dkt. Nos. 72, 78)

## DISCUSSION

I.   **LEGAL STANDARDS**

A.   **Motion to Dismiss**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "In considering a motion to dismiss . . .  the court is to accept as true all facts alleged in the complaint," Kassner, 496 F.3d at 237 (citing Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 87 (2d Cir. 2002)), and must "draw all reasonable inferences in favor of the plaintiff."  Id. (citing Fernandez v. Chertoff, 471 F.3d 45, 51 (2d Cir. 2006)).

A complaint is inadequately pled "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement,'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557), and does not provide factual allegations sufficient "to give the defendant fair notice of what the claim is and the grounds upon which it rests." Port Dock & Stone Corp. v. Oldcastle Northeast, Inc., 507 F.3d 117, 121 (2d Cir. 2007) (citing Twombly, 550 U.S. at 555 (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957))).

B.     **Lanham Act**

Section 43(a) of the Lanham Act provides, in pertinent part, that:

Any person who, on or in connection with any goods or services . . . uses in commerce any . . . false or misleading description of fact, or false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1).

To establish false advertising under Lanham Act § 43(a), a plaintiff must (1) demonstrate that the challenged statement is either literally false or, though literally true, likely to confuse or deceive consumers; (2) show that the defendant misrepresented an inherent quality or characteristic of a good or service; (3) show that the defendant placed the false or misleading statement in interstate commerce; and (4) prove that the plaintiff was injured as a result of the defendant's misrepresentation, either by a diversion of business or a loss of goodwill associated with the plaintiff's goods or services.

Davis v. Avvo, Inc., 345 F. Supp. 3d 534, 539-540 (S.D.N.Y. 2018) (citing Merck Eprova AG v.

Gnosis S.p.A., 760 F.3d 247, 255 (2d Cir. 2014)).

"To prove that first element, a plaintiff must show one of two different theories of

recovery:  the challenged advertisement is (1) literally false or (2) likely to mislead or confuse

consumers ('impliedly false'). . . .Under either theory, a plaintiff must also demonstrate that the

false or misleading representation involved an inherent or material quality of the product."

Lokai Holdings LLC v. Twin Tiger USA LLC, 306 F. Supp. 3d 629, 638 (S.D.N.Y. 2018).

"'Under both the Lanham Act and the Constitutional free speech clause, statements of opinion

about commercial matters cannot constitute false advertising. . . .'"  Davis, 345 F. Supp. 3d at

540 (quoting J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 27:67

(5th ed. 2017)).

### C.   New York General Business Law, Sections 349-350

N.Y. GBL Section 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." N.Y. GBL Section 350 prohibits "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state."  To successfully assert a claim under either section, "a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice."

Orlander v. Staples, Inc., 802 F.3d 289, 300 (2d Cir. 2015) (quoting Koch v. Acker, Merrall & Condit Co., 18 N.Y.3d 940 (2012)).  "The standards for bringing a claim under § 43(a) of the Lanham Act are substantially the same as those applied to claims brought under the New York common law for unfair competition and §§ 349 and 350 of the [NY GBL]."  Avon Prod., Inc. v. S.C. Johnson & Son, Inc., 984 F. Supp. 768, 800 (S.D.N.Y. 1997).

"Although competing businesses have standing to sue under these provisions, the provisions are fundamentally consumer protection devices, so 'the gravamen of the complaint must be consumer injury or harm to the public interest,' not mere competitive disadvantage."  Can't Live Without It, LLC v. ETS Express, Inc., 287 F. Supp. 3d 400, 412 (S.D.N.Y. 2018) (quoting Securitron Magnalock Corp. v. Schnabolk, 65 F.3d 256, 264 (2d Cir. 1995))

### D.   California's False Advertising Law and Unfair Competition Law

California's FAL prohibits any "unfair, deceptive, untrue, or misleading advertising."  Cal. Bus. & Prof. Code § 17500.  California's UCL prohibits "any unlawful, unfair or fraudulent business act or practice."  Cal. Bus. & Prof. Code § 17200.  "In contrast to its limited remedies, the unfair competition law's scope is broad."  Cel-Tech Comm's, Inc. v. Los Angeles Cellular Tel. Co., 20 Cal. 4th 163, 180 (1999).  "Section 17200 borrows violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable."  Id. (internal quotation marks and citations omitted).  "These claims

are substantially congruent to claims made under the Lanham Act." L.A. Taxi Coop., Inc. v. Uber Techs., Inc., 114 F. Supp. 3d 852, 860 (N.D. Cal. 2015) (internal quotation marks and citation omitted).

## II.   ANALYSIS

### A.   Defendants' Motion to Dismiss

Defendants have moved to dismiss the SAC to the extent it is premised on allegations relating to the SleepAuthority website, Defendants' promotional pricing, and Defendants' financing program.  (Def. Br. (Dkt. No. 74) at 6)

#### 1.   SleepAuthority Website

Defendants argue that Plaintiff's allegations related to the SleepAuthority website and Defendants' promotional pricing do not "allege a misrepresentation under the Lanham Act," because "Plaintiff fails to allege any basis as to how [] subjective opinion reviews can be false," and "the Sleep[]Authority site explicitly discloses its affiliation with Resident Home."  (Id. at 9, 11)

Plaintiff counters that "there were no disclosures of Defendants' ownership of SleepAuthority in connection with the misstatements at issue.  The social media advertisements and website promotions identified in the SAC were devoid of any consumer-facing statement connecting Defendants with their sham website."  (Pltf. Opp. Br. (Dkt. No. 73) at 12)  Plaintiff further argues that "the misstatements at issue are not third-party opinions, but rather Defendants' commercial advertisements pretending to be third-party opinions."  (Id. at 14)

The SAC cites reviews on the SleepAuthority website offering the following opinions concerning Defendants' mattresses:  (1) that they are "the highest rated mattresses of 2018" (SAC (Dkt. No. 46) ¶ 46); (2) that "[e]veryone [c]an't [s]top [t]alking [a]bout"

Defendants' mattresses (id. ¶ 47); and (3) that "[e]veryone [i]s [r]aving [a]bout" Defendants'

mattresses.  (Id. ¶ 48)  Plaintiff also complains about "a 'quiz' [on the SleepAuthority website]

that purports to help consumers determine 'What mattress style are you?'" but "generates the

unsurprising result that the consumer should purchase a Nectar or a DreamCloud mattress."  (Id.

¶ 50)  Because the cited statements are mere opinions, they are not actionable misrepresentations.

See Davis, 345 F. Supp. 3d at 540.

Plaintiff argues, however, that these opinions are actionable because the

SleepAuthority website is only "purportedly independent," and Defendants' have not adequately

disclosed their control over the website.  (Pltf. Opp. Br. (Dkt. No. 73) at 13)  But the SAC pleads

that the "about" page of the SleepAuthority website discloses Defendants' ownership of the

SleepAuthority website.  (SAC (Dkt. No. 46) ¶ 49)  Moreover, all of the social media postings

that Plaintiff claims are misleading link back to the SleepAuthority website.  (Id. ¶¶ 44-48)  To

the extent that any consumer might potentially be misled as to the source of these opinions, the

"about" page on the SleepAuthority website cures this issue.  See Casper Sleep, Inc. v. Mitcham,

204 F. Supp. 3d 632, 639 (S.D.N.Y. 2016) (noting that defendant's "disclosure that he is an

'affiliate for many different companies' is perfectly accurate" and it "is implausible that [the

defendant's] readers would infer from an admission of pecuniary interest in some but not all

mattress brands that [the defendant] is, in fact, entirely unbiased.  To the extent plaintiff takes

issue with defendants' claim of 'brand-agnosticism' and 'retailer-agnosticism,' those statements

are too subjective and opinion-laden to support a Lanham Act claim").

Plaintiff has offered no case law in support of its claim that Defendants'

disclosure on the "about" page is inadequate, because it is "separate, deep-linked[, and] detached

entirely from the misstatements at issue."  (Pltf. Opp. Br. (Dkt. No. 73) at 12)  Given that

Plaintiff's theory of deception is predicated entirely on the notion that Defendants falsely portray SleepAuthority as an independent entity, an accessible disclosure on that website addressing ownership is sufficient.

The cases cited by Plaintiff are not to the contrary.  (Id. at 13)  In Pegasystems, Inc. v. Appian Corp., 424 F. Supp. 3d 214 (D. Mass. Dec. 5, 2019), the plaintiff – a software company – brought a Lanham Act claim challenging a report used by defendant in advertising. The report – which had been commissioned by the defendant – compared the defendant favorably to plaintiff and other competitors.  The "commission [was] not disclosed anywhere in the [r]eport or any public communications about it," however.  Id. at 219-20.  Here, by contrast, the SleepAuthority website discloses that Defendants own the website.  And while the court in GOLO, LLC v. HighYa, LLC, 310 F. Supp. 3d 499 (E.D. Pa. 2018) noted that "liability can arise under the Lanham Act" for "sham" websites purportedly operated by a third parties, id. at 505, the court found that plaintiff had not plausibly pled any such claim, in part because the defendants "disclose[d] on their [web]sites . . . commercial affiliations."  Id. at 506.

The Court concludes that Plaintiff's allegations regarding the SleepAuthority website are not actionable under the Lanham Act, because the SleepAuthority website discloses Defendants' ownership.  Because "[t]he standards for bringing a claim under § 43(a) of the Lanham Act are substantially the same as those applied to claims brought under . . . [NY GBL] §§ 349 and 350," the SleepAuthority website allegations are also not actionable under NY GBL. Avon, 984 F. Supp. at 800.

2.     **Promotional Pricing**

Defendants argue that the SAC's allegations regarding their promotional pricing are not actionable, because Plaintiff has not pled "any facts supporting a plausible inference of harm to Casper." (Def. Br. (Dkt. No. 74) at 8)

Plaintiff counters that, under the Lanham Act, it "must only allege a '"reasonable basis"' for believing that [its] interest is likely to be damaged by the false or misleading advertising," and that "the threshold for establishing a 'reasonable basis' is substantially lower when the parties are in direct competition." (Pltf. Opp. Br. (Dkt. No. 73) at 9-10 (quoting Ortho Pharm. Corp. v. Cosprophar, Inc., 32 F.3d 690, 694 (2d Cir. 1994)))

The SAC alleges that Defendants "falsely advertised discounts as limited offers when, in reality, those discounts are always available and the products are never sold at their purported 'regular' prices." (SAC (Dkt. No. 46) ¶ 97) Plaintiff further alleges, without explanation, that "potential Casper mattress purchasers . . . have been deceived into purchasing Defendants' products . . . [and] have purchased mattresses from Casper's competitor rather than Casper." (Id. ¶ 109)

Accepting Plaintiff's allegation that Defendants' "sale" price is always available, Plaintiff must plausibly allege that it suffered harm. It must – but has not – plead facts demonstrating that there are consumers who would have purchased its mattresses, but did not because Defendants' "sale" price was advertised as a limited time offer. Plaintiff's bare allegations provide no reasonable basis for concluding that such consumers exist. Given that consumers can compare Defendants' prices against those charged by Plaintiff, it is not plausible

that consumers would purchase Defendants' mattresses merely because they were led to believe that Defendants' prices were only temporarily available.[8]

Because Plaintiff has not plausibly alleged that it suffered injury as a result of Defendants' promotional pricing, Plaintiff's Lanham Act and NY GBL claims will be dismissed to the extent they are premised on Defendants' promotional pricing.

### 3.   Financing Program

Defendants argue that to the extent that the SAC's Lanham Act and NY GBL claims are premised on their financing program, those claims fail, because Plaintiff has "not [pled] any facts supporting a plausible inference of harm to Casper."  (Def. Br. (Dkt. No. 74) at 8)

Plaintiff argues that there is a "reasonable basis" for its claim of injury, because "Defendants' deceptive Financing Program lured predominantly low-income consumers to purchase Defendants' mattresses instead of Casper's by falsely advertising lower financing terms."  (Pltf. Opp. Br. (Dkt. No. 73) at 10)  According to Plaintiff, Defendants mislead consumers about the cost of financing the purchase of their mattresses by not disclosing the annual percentage rate of the financing, by obfuscating certain fees, and by charging "an extra dollar for every monthly payment."  (SAC (Dkt. No. 46) ¶¶ 90-92)  Defendants also falsely represent to consumers that they offer a "risk-free trial" for a year, when in reality consumers have a three-day window during which they can cancel the transaction at no cost.   (Id. ¶¶ 93-95)

---

[8]  Plaintiff asserts that "[t]he National Advertising Division of the Better Business Bureau . . . recently determined that this very claim was untruthful and recommended Nectar discontinue it." (Pltf. Opp. Br. (Dkt. No. 73) at 15)  The issue here, however, is whether the SAC pleads facts that plausibly allege under Iqbal and Twombly that Plaintiff suffered competitive harm as a result of Defendants' promotional pricing.  For the reasons explained above, the SAC does not adequately plead such harm.

Plaintiff alleges "[u]pon information and belief [that] consumers have purchased Defendants' products based on Defendants' misrepresentations concerning their Financing Plan."  (Id. ¶ 96)

As with the promotion pricing allegations, to adequately allege injury, Plaintiff must plead facts demonstrating that there are consumers who would have purchased its mattresses, but instead purchased Defendants' mattresses because of Defendants' misleading statements about their financing program.  While Plaintiff has alleged that it is a direct competitor with Defendants in the online mattress market, Plaintiff also alleges that "dozens" of competitors operate in this market.  (SAC (Dkt. No. 46) ¶ 19)  Given the large number of companies competing in the online mattress market, Plaintiff must plead non-conclusory facts that make it plausible that Plaintiff lost sales because of Defendants' misleading statements concerning their financing program.  Plaintiff's bare allegations are not sufficient to demonstrate that Plaintiff suffered any such lost sales.  Plaintiff has not, for example, alleged that Defendants referenced Plaintiff's mattresses or financing program in advertising Defendants' mattresses and financing program.  See Societe Des Hotels Meridien v. LaSalle Hotel Operating P'ship, L.P., 380 F.3d 126, 130 (2d Cir. 2004) ("We have consistently held that where the defendant has drawn a direct comparison between its own product and that of the plaintiff, we are inclined, without much more, to find standing to bring Lanham Act claims.").  Absent such allegations, Plaintiff's assertion of harm is merely speculative.

This result is consistent with Davis v. Avvo, Inc., 345 F. Supp. 3d 534 (S.D.N.Y 2018).  In Davis, plaintiff was a New York attorney who sued an online platform that maintained profiles of attorneys, claiming that the platform's deceptive endorsements of other attorneys had cost him business.  Davis, 345 F. Supp. 3d at 539.  The court rejected the plaintiff's "conclusory allegations," finding that "[t]he plaintiff does not offer any facts showing that consumers rely on

the allegedly misleading Avvo ratings, pro badges, client reviews, or statements by the defendant in choosing or gauging the reputation of an attorney.  Nor does the plaintiff offer facts connecting these attributes of the defendant's website to reputational harm or lost business."  Id. at 544.  In Davis, as here, the website at issue did not make a direct comparison between plaintiff and any particular competitor.  Id. at 539.

In re Elysium Health-Chromadex Litig., No. 17 Civ. 7394, 2018 WL 4907590 (S.D.N.Y. Sept. 27, 2018) – cited by Plaintiff (Pltf. Opp. Br. (Dkt. No. 73) at 11) – is not to the contrary.  In Elysium Health, the relevant market was much more concentrated, as the counterclaimant claimed to be the only bona fide U.S. supplier of "NR," the ingredient at issue in the litigation.  NR is a chemical compound for which the counterclaimant had received Food and Drug Administration ("FDA") approval, and is one of two main ingredients in the counterdefendant's product.  Elysium Health, 2018 WL 4907590, at *2.  The counterclaimant allegedly had supplied NR to the counterdefendant until their business relationship soured, at which point the counterdefendant "obtained a new supplier of NR," while continuing to advertise its products based on clinical trials that had studied the counterclaimant's FDA-approved NR. Id. at *2, *12.  The court found that these allegations "g[ave] rise to a plausible inference of injury."  Id. at *12.  Indeed, one may readily infer how the advertising at issue in Elysium Health could have harmed the business of the sole FDA-approved producer of NR.  Here, by contrast, there are "dozens" of competitors, and Plaintiff has not pled facts that make it plausible that Plaintiff lost sales to Defendants as a result of Defendants' advertising concerning their financing program.

17

Accordingly, Defendants' motion to dismiss Plaintiff's Lanham Act and NY GBL claims will be granted to the extent that those claims are premised on Defendants' financing program.

**B.      Plaintiff's Motion to Dismiss Defendants' Counterclaims**

Plaintiff has moved to dismiss Defendants' counterclaims alleging that Plaintiff violated the Lanham Act and California law by manipulating mattress review websites and by manipulating reviews on Google and Amazon.  (Pltf. Br. (Dkt. No. 79) at 10)

**1.      Website Manipulation**

In their counterclaims, Defendants allege that three mattress review sites – Sleepopolis, MattressClarity, and SlumberSage – made their reviews of Plaintiff's mattresses more favorable after they were purchased by JAKK Media.  Plaintiff provided a loan to JAKK Media for the purchase of the Sleepopolis mattress review website.  (Counterclaims (Dkt. No. 20) ¶¶ 17-18)  Defendants allege that the more favorable reviews for Plaintiff's mattresses were the product of Plaintiff's financial influence over JAKK Media.  (Id. ¶ 19)

Plaintiff counters that Defendants' "accusation of 'financial influence' . . . is not actionable against Casper under Section 43(a) without an affirmative statement by Casper to the contrary."  (Pltf. Br. (Dkt. No. 79) at 11 (emphasis in original))  Plaintiff further contends that "review websites' opinions about the quality of a particular product are not actionable misstatements under Section 43(a)."  (Id.)

As discussed above in connection with Plaintiff's SleepAuthority website allegations, favorable reviews are not actionable misrepresentations because they are mere opinion.  See Davis, 345 F. Supp. 3d at 340.  As to Plaintiff's purported financial influence over the reviews as a result of the loan it provided to JAKK Media, Defendants do not dispute that the

"Sleepopolis [website] states that Casper funded a third-party acquisition of the Sleepopolis website."  Defendants instead complain that Sleepopolis' "claims to be 'owned entirely independently of Casper' and that 'editorial content is completely in [their] hands.'"  (Def. Opp. Br. (Dkt. No. 83) at 12 (citing Counterclaims (Dkt. No. 20) ¶ 17 n.3 (citing Sleepopolis' website)) (second alteration in Def. Opp. Br.))

As discussed above in connection with the SleepAuthority website, Sleepopolis's disclosure of Casper's financial relationship with JAKK Media and its role in the acquisition of Sleepopolis is sufficient to find that the reviews – which again, are opinions – are not impliedly false.  See Mitcham, 204 F. Supp. 3d at 639.

As to SlumberSage, Defendants do not allege how the reviews of Plaintiff's mattresses changed after Casper loaned money to JAKK Media.

As to MattressClarity, Defendants cite to a review that – while giving a slightly more favorable rating to Plaintiff's mattress than before JAKK Media's purchase of Sleepopolis – states that Plaintiff's mattress "isn't currently one of my top picks."  (Counterclaims (Dkt. No. 20) ¶ 18)

Accordingly, as to SlumberSage and MattressClarity, the Court concludes that Defendants have not plausibly alleged that Plaintiff's financial influence over JAKK Media has led to those websites offering misleading reviews of Plaintiff's mattresses.

Defendants' citation to Grasshopper House, LLC v. Clean and Sober Media, LLC, No. 2:18-cv-00923-SVW-RAO, 2018 WL 6118440 (C.D. Cal. July 18, 2018) is unavailing. (Def. Opp. Br. (Dkt. No. 83) at 12)  In Grasshopper House, the website at issue had not "disclose[d] its affiliation" with the defendant.  Grasshopper House, 2018 WL 6118440, at *10.

Here, by contrast, Defendants do not dispute that Plaintiff's affiliation with Sleepopolis is disclosed.

In short, there is no actionable misrepresentation under the Lanham Act with respect to the alleged website manipulation. As to the CA UCL and FAL claims, "[t]hese claims are substantially congruent to claims made under the Lanham Act." L.A. Taxi Coop., 114 F. Supp. 3d at 860 (internal quotation marks and citation omitted). Indeed, Defendants concede that their California UCL claim will "rise or fall with the alleged predicate violation – here, Plaintiff's violation of the Lanham Act and California's FAL."[9] (Def. Opp. Br. (Dkt. No. 83) at 15) Accordingly, Plaintiff's motion to dismiss Defendants' counterclaims will be granted to the extent that the counterclaims are premised on website manipulation allegations.

### 2.      Manipulation of Google and Amazon Reviews

In their counterclaims, Defendants allege that (1) "as of July 10, 2018, Google Shopping did not have a single review of Casper.com after December 20, 2017," and that while Google has "30,197 reviews of Casper [mattresses] with an average rating of 4.9 stars . . . [,] many of the five star reviews have no comments" and "many of the 1, 2, and 3 star reviews have comments" (Counterclaims (Dkt. No. 20) ¶ 20); (2) "the independent website ReviewMeta.com . . . gives Casper's Amazon reviews "a 'Fail' grade due to the detection of unnatural reviews,"

---

[9] Defendants separately argue that the California "UCL's unfair conduct prong covers any business practice that 'significantly threatens or harms competition,'" and that the alleged conduct is "precisely the type[] of unfair business practice[] that the UCL's unfair conduct prong prohibits." (Def. Opp. Br. (Dkt. No. 83) at 15-16 (first citing Cel-Tech, 20 Cal. 4th at 180, then citing Iyogi Holding PVT Ltd. v. Secure Remote Support Inc., No. C 11-0592 CW, 2011 WL 6291793 (N.D. Cal. Oct. 25, 2011)) Cel-Tech merely sets forth the legal standard, however, and Iyogi addresses an unopposed motion for a default judgment. Moreover, Iyogi involves "shill reviews" with no allegation of any curative disclosure. Iyogi, 2011 WL 6291793, at *6. Defendants have not articulated any other way in which the alleged website manipulation is unfair beyond that which this Court has already discussed.

and deleted "472 reviews with an average score of 4.7"; (id. ¶ 21); and (3) "435 reviews, or roughly 40% of Casper's total Amazon reviews, were deleted in March 2018, indicating those reviews were detected as fake." (Id.)

Plaintiff argues that Defendants' counterclaims should be dismissed to the extent they are premised on alleged manipulation of Google and Amazon reviews, because (1) "[t]here is not a single statement by Casper – false or otherwise – identified in these Counterclaims"; (2) "Defendants [do not] even identify any specific review they claim to be false"; and (3) "Defendants have not adequately alleged facts to support the inference that Casper manipulated any customer reviews." (Pltf. Br. (Dkt. No. 79) at 13)

Defendants counter that "[a] false advertising claim under the Lanham Act does not require a false statement, but only use of that statement or other prohibited conduct." (Def. Opp. Br. (Dkt. No. 83) at 13 (emphasis in original)) Defendants further contend that Plaintiff "engaged in a systematic practice of manipulating online reviews either directly or through its agents . . . [,] [which] has created the false and misleading impression with consumers that [Plaintiff] has received more positive consumer reviews than it actually has[.]" (Id. (emphasis in original))

The Court concludes that the counterclaims fail to state a claim. As to the Google reviews, the fact that certain reviews "have no comments" does not plausibly suggest that these are fake reviews generated by Plaintiff or its agents. There are any number of reasons why a review might have no comments, and it is entirely speculative to contend that all such reviews are fake. Moreover, the fact that a third-party website – or Amazon itself – deleted several hundred favorable Amazon reviews for Casper mattresses does not plausibly suggest that these deleted reviews were fake reviews generated by Plaintiff or its agents. Indeed, Defendants'

counterclaims do not allege that Plaintiff or its agents posted the deleted reviews.  Instead, the counterclaims merely allege that Plaintiff "manipulates" reviews on Amazon, without explaining how Plaintiff accomplishes the alleged manipulation.

Because Defendants' allegations that the Amazon and Google reviews were "manipulated" are mere "'naked assertion[s]' devoid of 'further factual enhancement,'" Iqbal, 556 U.S. at 678, they do not "raise a right to relief above the speculative level," Twombly, 550 U.S. at 555, and therefore cannot survive a motion to dismiss.

The cases cited by Defendants (Def. Opp. Br. (Dkt. No. 83) at 14) are not to the contrary. In Interlink Products Int'l, Inc. v. F & W Trading LLC, No. 15-1340 (MAS) (DEA), 2016 WL 1260713 (D.N.J. Mar. 31, 2016), plaintiff alleged a specific mechanism through which manipulation of Amazon reviews occurred:  "sending excessive quantities of free samples of products to professional reviewers so that the Amazon reviews for those products are flooded with professional reviews . . . [which] are inherently biased and tend to favor the seller." Id. at *8.  Similarly, in Vitamins Online, Inc. v. HeartWise, Inc., 207 F. Supp. 3d 1233 (D. Utah 2016), plaintiff alleged that defendant "offered free product[s] in exchange for posting positive reviews on its Amazon product pages[,] and asked its employees to block vote[s] on the helpfulness of [the] reviews." Id. at 1240.

The cases cited by Defendants merely demonstrate the insufficiency of their counterclaims, which plead no facts explaining how Plaintiff manipulated the Google or Amazon reviews.

Accordingly, to the extent that Defendants' counterclaims are premised on alleged manipulation of Google and Amazon reviews, Plaintiff's motion to dismiss will be granted.

## III.   <u>LEAVE TO AMEND</u>

District courts "ha[ve] broad discretion in determining whether to grant leave to amend." <u>Gurary v. Winehouse</u>, 235 F.3d 793, 801 (2d Cir. 2000).  Leave to amend may properly be denied in cases of "'undue delay, bad faith, or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of the allowance of the amendment, futility of amendment, etc.'" <u>Ruotolo v. City of N.Y.</u>, 514 F.3d 184, 191 (2d Cir. 2008) (quoting <u>Foman v. Davis</u>, 371 U.S. 178, 182 (1962)); <u>see</u> <u>Murdaugh v. City of N.Y.</u>, No. 10 Civ. 7218(HB), 2011 WL 1991450, at *2 (S.D.N.Y. May 19, 2011) ("Although under Rule 15(a) of the Federal Rules of Civil Procedure leave to amend complaints should be 'freely given,' leave to amend need not be granted where the proposed amendment is futile." (citations omitted)).

Here, Defendants will be granted leave to amend with respect to their claim that Plaintiff manipulated Amazon and Google reviews.  "Where the possibility exists that [a] defect can be cured," leave to amend "should normally be granted" at least once.  <u>Wright v. Ernst & Young LLP</u>, No. 97 CIV. 2189 (SAS), 1997 WL 563782, at *3 (S.D.N.Y. Sept. 10, 1997), <u>aff'd</u>, 152 F.3d 169 (2d Cir. 1998) (citing <u>Oliver Sch., Inc. v. Foley</u>, 930 F.2d 248, 253 (2d Cir. 1991)). Moreover, where a claim is dismissed on the grounds that it is "inadequate[ly] pled," there is "a strong preference for allowing plaintiffs to amend."  <u>In re Bear Stearns Companies, Inc. Sec., Derivative, & ERISA Litig.</u>, No. 07 CIV. 10453, 2011 WL 4072027, at *2 (S.D.N.Y. Sept. 13, 2011) (citing <u>Ronzani v. Sanofi S.A.</u>, 899 F.2d 195, 198 (2d Cir. 1990)).

As to Defendants' counterclaims based on financial influence over websites, amendment would be futile as to Sleepopolis, because Plaintiff's role is disclosed on the Sleepopolis website.  Amendment also would be futile as to MattressClarity, because the review

of Plaintiff's products was unfavorable.  As to SlumberSage, however, the deficiency is inadequate factual allegations.  Accordingly, Defendants will be granted leave to replead to the extent that they can allege specific facts demonstrating that SlumberSage changed its reviews to be more favorable to Plaintiff's products after Plaintiff issued its loan to JAKK Media.

Plaintiff will be granted leave to amend with respect to its promotional pricing and financing program allegations, but only to the extent it can plead additional facts demonstrating that it suffered harm as a result of Defendants' promotional pricing and financing programs.  Plaintiff will not be granted leave to amend as to its SleepAuthority allegations, as it cannot overcome the fact that Defendants' ownership was disclosed.

Any motion for leave to amend is to be filed by **October 6, 2020**.  The proposed Third Amended Complaint or proposed Amended Counterclaim is to be attached as an exhibit to the motion papers.

## **CONCLUSION**

Defendants' motion to dismiss Plaintiffs' claims in the Second Amended Complaint, to the extent they are premised on Defendants' Sleep Authority website, promotional pricing and financing program, is granted.  Plaintiff's motion to dismiss Defendants' counterclaims is granted.  The Clerk of Court is directed to terminate the motions.  (Dkt. No. 72, 78)

The initial pretrial conference in this matter will take place on **October 15, 2020 at 11:00 a.m.** by telephone.  The parties are directed to dial 888-363-4749 to participate, and to enter the access code 6212642.  The press and public may obtain access to the telephone conference by dialing the same number and using the same access code.  The Court is holding multiple telephone conferences on this date.  The parties should call in at the scheduled time and

24

wait on the line for their case to be called.  At that time, the Court will un-mute the parties' lines. Seven days before the conference, the parties must email Michael_Ruocco@nysd.uscourts.gov and GardepheNYSDChambers@nysd.uscourts.gov with the phone numbers that the parties will be using to dial into the conference so that the Court knows which numbers to un-mute. The email should include the case name and case number in the subject line.

Seven days before the conference, the parties will submit a joint letter addressing the following in separate paragraphs:  (1) a brief description of the case, including the factual and legal bases for the claims and defenses; (2) any contemplated motions; and (3) the prospect for settlement.  For the Court's convenience, the parties must set forth the conference's date and time in the joint letter's opening paragraph.  In preparing their joint letter and proposed case management plan, the parties will consult the Court's Individual Practices and model Case Management Plan and Scheduling Order – both of which are available on this District's website.

Dated: New York, New York
     September 23, 2020

SO ORDERED.

_____

Paul G. Gardephe
United States District Judge

25